Jones v. Davenport.

---

WILLIAM L. JONES

*v.*

MARIA DAVENPORT.

DANIEL B. FAYERWEATHER et al.

*v.*

MARIA DAVENPORT.

THE FIRST NATIONAL BANK OF SOMERVILLE

*v.*

MARIA DAVENPORT.

1. Prior to the passage of the statute securing to a married woman her property, and while the common law was in force, a legacy or distributive share due to a wife on her marriage, or coming to her during coverture, became at once the property of her husband.

Jones *v.* Davenport.

2. At common law, marriage operated as a gift to the husband of all his wife's personal property.

3. Under the law now in force in this state, a husband is bound to account to his wife for such part of the principal of her estate as he receives for her, but not for such part of her income as he receives and spends with her knowledge and without objection.

4. A simple contract creditor may, in virtue of the lien which the statute gives him, for his debt, on the lands of which his debtor dies seized, maintain an action in equity to invalidate a conveyance made by his debtor in fraud of his rights.

5. And he may maintain such action, notwithstanding he is attempting, by legal process, to collect his debt of another person who is liable for it.

On final hearing on pleadings, and proofs taken orally.

*Mr. Enos W. Runyon,* for William L. Jones.

*Mr. Edward M. Colie* and *Mr. Thomas N. McCarter,* for Fayerweather and others.

*Mr. James J. Bergen,* for the First National Bank.

*Mr. Alvah A. Clark* and *Mr. Benjamin Williamson,* for the defendant.

VAN FLEET, V. C.

These three suits, by arrangement of counsel, were heard together, but not consolidated.

The complainants are creditors of James S. Davenport, deceased, and the defendant is his widow. The suits were brought to set aside transfers of certain property, which Mr. Davenport made to the defendant just before his death. The ground on which such judicial action is sought is, that the transfers were made to defraud creditors. Mr. Davenport died on the 6th of July, 1884. He left a will, bearing date January 28th, 1878, by which he gave all his property to the defendant absolutely, and appointed her his sole executrix. She is made a defendant in both her individual and representative capacities. Mr. Davenport, at the time of his death, was liable, in addition to his in-

·dividual debts, for the debts of two copartnerships. He was a member of the firm of Davenport Brothers, composed of himself and his two brothers, Thomas and Samuel W. This partnership was formed in 1853. The members did business together as crockery merchants in the city of New York, and the firm continued in existence up to the time of Mr. Davenport's death. James S. and Samuel W. Davenport are both dead. James S. died, as already stated, on the 6th of July, 1884, and Samuel W. Davenport on the 1st of August following. Thomas alone survives. The estate of Samuel W., it is admitted, is insolvent. The assets of Davenport Brothers are insufficient to pay their debts. The affairs of that firm are being wound up under the direction of this court. James S. Davenport had also been a member of the firm of Davenport, Johnson & Co., which was formed on the 1st of November, 1880, under an agreement that it should carry on business for three years, and was composed of James S. Davenport and his son, James B. Davenport, his son-in-law, Edward L. Voorhis, and a young man by the name of William S. Johnson, of whom James S. Davenport had been guardian. This partnership was formed to carry on the business of buying and selling supplies for cotton and woolen mills at two different places, namely, the city of New York and the city of Atlanta, in the state of Georgia. By the copartnership agreement, Johnson alone was required to put in a money capital. He was to contribute $15,000, James B. Davenport and Voorhis were to contribute their "influence, experience, trade acquaintance and personal services," but no money. James S. Davenport was not to contribute any money, nor to share in the profits, but he was to aid the firm as much as possible by the use of his name and influence. Johnson died in July, 1881, but the business of the firm, notwithstanding, was continued until about the 1st of November, 1883, when the firm was compelled to suspend in consequence of its insolvency becoming known. A receiver of its assets was subsequently appointed in Georgia, who realized scarcely enough to pay one-fourth of its liabilities.

The debts of the complainants represent the three classes of

liabilities. William L. Jones, the complainant in the first suit, is a creditor of Davenport Brothers. A part of his debt was contracted nearly twenty years ago. He has recovered two judgments in the supreme court of this state, by confession, the first being entered November 26th, 1884, against Thomas Davenport individually, for $8,151, and the second, December 25th, 1884, against Thomas Davenport, as the survivor of Davenport Brothers, for $7,320. Both are founded on debts of Davenport Brothers. The complainants in the second suit, Daniel B. Fayerweather and others, are creditors of Davenport, Johnson and Company. The principal part of their debt was contracted between March 1st, 1880, and November of the same year. They recovered a judgment in the supreme court of the state of New York, for over $11,000 against James B. Davenport, and Edward L. Voorhis, as the survivors of the firm, on the 23d of August, 1884, and subsequently, and within the time limited for that purpose, exhibited their claim, under oath, to the defendant as executrix. The complainant in the third suit, The First National Bank of Somerville, holds a debt incurred by James S. Davenport, in his individual capacity, in 1878 or 1879. A judgment was recovered for this debt against the defendant as executrix, in the supreme court of this state, on the 26th of February, 1885. The estate of James S. Davenport, deceased, was declared insolvent by the orphans court of Somerset county, on the 29th of May, 1885. An execution issued on the last-mentioned judgment, was set aside after the decree of insolvency was made.

The transfers denounced as fraudulent are seven in number— five of land and two of personal property. The first is a deed made by Thomas Davenport and wife to the defendant, bearing date March 1st, 1879, conveying the undivided one-third of a tract of land, in Jersey City, for a consideration, as the deed states, of $11,000. Thomas held the one-half of the one-third of the land conveyed, or the one-sixth, in his own right, and the other one-sixth as trustee for his brother James. James's interest was conveyed to the defendant by James's direction. Thomas was paid for his interest, but the charge is, that the conveyance, as to James's interest was voluntary, and made with the intent

to defraud creditors.   Afterwards, and in 1884, James S. Davenport made four conveyances to his son-in-law, Hugh N. Hartwell, who, immediately after acquiring title, passed the same, in each instance on the same day, to the defendant.   She thus became invested with her husband's title to the lands in controversy.   The first deed bears date January 28th, 1884, and conveys a tract of land in the city of Plainfield for an apparent consideration of $13,537.71 ;   the second is dated April 1st, 1884, and conveys the house and lot, where all the parties resided at the date of the deeds, situate on the corner of Cliff and Cedar streets, in the town of Somerville, and states that the conveyance was made for a consideration of $11,520.   The defendant swears that it was understood that the consideration paid for the last described property, also paid for the goods and chattels, belonging to her husband, in the house and on the premises conveyed, including several carriages, a pair of horses and their trappings. The third and fourth deeds each bear date May 26th, 1884, one conveys the undivided half of about sixty acres of land, situate in the township of Bridgewater, Somerset county, which has been called in these suits the Cornell property, and states that the consideration paid was $7,072.50 ; and the other conveys the undivided half of what has been known in the trial of these cases as the Steele property, situate in the town of Somerville, and purports to have been made for a consideration of $4,925.26. The transfers of personal property were made by James S. Davenport directly to the defendant, and consist in the passing over to her, on the 21st of April, 1884, of eighty-six shares of the capital stock of the First National Bank of Jersey City, for an alleged consideration of $12,479.68, and on the 9th of May, 1884, of fourteen other shares of the same stock, for a consideration of $2,979.   This stock, the defendant admits, she sold, in September, 1884, for $18,000, thus realizing in about five months after she got the stock, over $2,500 more than she claims to have paid for it.

So that it appears, in less than six months prior to his death, and after he knew that one of the firms, of which he had been a member, was insolvent, Mr. Davenport made over to his wife

property, which, according to his estimate of the value of a part, and according to the value of the residue as fixed by an actual sale, was worth over $59,000. In addition to the property so transferred, it appears that a plan was devised, about the 9th of June, 1884, with Mr. Davenport's consent, by which the defendant subsequently got possession of, and appropriated to her own use, four bonds, of $1,000 each, and worth a little more than par, issued by the Central Railroad of New Jersey, and which had been pledged by her husband, with four other like bonds, for a debt of Davenport Brothers. So far as appears, the defendant had not the least pretence of title to these bonds. She did not buy them, nor were they bought with her money. Nor is there any evidence in the case, which will justify a belief, that her husband made a gift of them to her, at a time when he was competent, so far as the rights of his creditors were concerned, to make such a disposition of his property. The bonds were never delivered to her, either actually or symbolically, until after the 9th of June, 1884, and then he was insolvent. It also appears that in 1879 or 1880 certain lands, situate at Raritan, in Somerset county, belonging to Davenport Brothers, were exchanged by James S. Davenport for two houses and lots in the city of Brooklyn, and that the title to the Brooklyn property, instead of being made to the firm, was, by James's direction, made to the defendant. He is charged on the books of the firm with $5,000 as the value of the firm's interest, but the defendant paid nothing for this interest at the time the exchange was made, nor does it appear that in any of the subsequent transactions, between the defendant and her husband, any allowance was made to him for this property. It thus appears, as a fact, standing free from dispute, that in less than five years prior to his death, James S. Davenport made over to his wife property which, according to his valuation, was worth over $69,500, and that of this amount over $59,000 was passed to her within six months of his death. Besides, the defendant admits that her husband, from time to time during their whole married life, furnished her with money whenever she desired it, and in just such amounts as she asked for. And she also says, that she spent a

great deal of money, that she and her husband regarded his purse as their common property, upon which she was at liberty to draw at any time for just what she wanted.

The ground on which the validity of these several transfers is assailed is, that they are not supported by real or honest considerations; in other words, that the debts, on which it is alleged they rest, were neither actual nor honest, but pure fabrications. None of the transfers rest on a money consideration actually paid at the time the transfer was made, but the claim in each instance is that it was made to discharge a liability which the husband had incurred, at an antecedent period, in receiving money belonging to his wife. In one instance the liability, which has been attempted to be made the basis of one of the transfers, arose, if it was possible for it ever to have an existence, nearly forty years prior to the date of the transfer, and the husband, in computing the amount of his liability in that case, added interest for the whole of this long period, and thus swelled the amount of his debt to more than thrice its original amount. The debt originally, it is said, was $900, and at the date of the transfer, the husband computed it at $2,989. It constituted the consideration for the last transfer of bank stock.

One of the sources from which the defendant attempts to trace her right to the money, which constituted the foundation of the consideration of some of the transfers under which she claims, is the estate of her father. Her father died in 1838. She and her husband were married in 1845. The defendant, at the time of her marriage, was about nineteen years of age. She says that her husband, shortly after their marriage, received $900 from her father's estate, and $3,000 or $4,000 from the same source about two years afterward. Both sums, it will be seen, were received while the common law, regulating the property rights of married persons, was still in force in this state, and when marriage operated as an absolute gift to the husband of all his wife's personal property, and when the existence of a wife was so completely merged in that of her husband as to preclude her from acquiring, during her coverture, any right in personal property which she could hold against her husband without his consent.

*Clancy on Husband and Wife 1, 2.* By the common law, a legacy or distributive share due to a wife on her marriage, or coming to her during her coverture, became at once the property of her husband, and on his reducing it to possession, it became his absolutely and unalterably. *Horner* v. *Webster, 4 Vr. 387 ; 2 Kent's Com. 135 marg.* The $3,900 or $4,900, which the defendant's husband received from her father's estate, must then be regarded as his property, as much so as though he himself, and not she, had been the person who, as next of kin or legatee, was entitled to the money. And the money must be so regarded and dealt with in this case, unless it has been clearly proved that the husband, at a time when he could make such a disposition of his property without harm to his creditors, made it over to the defendant by way of settlement or gift. That is the only way he could make it over to her. He could not deliver it over to her as a payment, in discharge of a debt incurred by him in receiving the money, for, as the law stood when he received it, he did not receive her money, but his own. The money, on the defendant's marriage, became subject to the absolute control of her husband, and on his reducing it to possession, it became his property just as effectually as it was possible for any property to be vested in him.

No valid settlement or gift of this money has been shown. Indeed, there is no evidence tending to show that Mr. Davenport, at any time when, in consequence of his freedom from debt, he was competent to make a gift of his property, ever thought of making this money over to his wife. There was no reason, until a few years before his death, why either he or the defendant should desire or think of such a thing. Up to that time all his business ventures had been successful ; his credit was good, and his standing as a business man high ; he believed he was wealthy and so did his wife ; she had whatever she wanted ; his purse was regarded as their common property, to which she was at liberty to go for whatever she desired. This was the condition of affairs in January, 1878, when Mr. Davenport made his will. By that instrument he gave all his property to his wife. His wife knew that he had done so. As matters then stood, it is

Jones *v.* Davenport.

scarcely credible that either the defendant or Mr. Davenport would have supposed that any other provision or arrangement, for her benefit, was necessary or desirable. The provision for her benefit was as ample as it was possible to make it, and his pecuniary condition, as they understood it, made that provision perfectly secure. A gift at that time, to the defendant, of any considerable part of his property, or even an effort to separate the property which he had derived through her from his other property, would have stood in strange contrast not only with all their previous conduct, in relation to their property rights, but with his pecuniary condition, as they understood it, and also with the provision which he had made for her future. These circumstances show quite conclusively, as I think, that up to the time he made his will there never was the slightest intention on the part of Mr. Davenport to abandon his right to this money, nor to make it over to the defendant. Nor is there any evidence tending to show that he subsequently entertained such a purpose, until his health became impaired and he was threatened with pecuniary disaster. After that, however, it is evident, from the whole course of his conduct, in arranging the transfer of his property to his wife, that his love for her made him extremely desirous to shield her from the consequences of his misfortune, and to effect that purpose, he obviously resorted to pretexts, in contriving apparent considerations for some of the transfers, which he would have looked upon, while he stood in the integrity of his better days, and when his moral sense was unimpaired, as dishonest devices.

But even after his moral vigor had become impaired, he did not attempt to treat his receipt of this money as the creation of a debt against himself, until most other expedients had been exhausted. It was not until the ninth of May, 1884, that an attempt was made to use any part of the money received by him from his father-in-law's estate, as a consideration for the transfer of his property to the defendant. It is true that there may be found in that part of the defendant's evidence, and also in that . of her son, which attempts to show the consideration paid for her husband's interest in the Jersey City property, which Thomas

Jones v. Davenport.

Davenport conveyed to her on the first of March, 1879, vague conjectures that it is possible James S. Davenport intended that the transfer of his interest in that property should discharge his liability to the defendant for the money which he had received from her father's estate, but it seems to me to be entirely clear, that their statements in that regard are nothing but guesses, and also, that in guessing, they spoke rather according to what they wished the understanding might have been, than what it was. That conveyance was made, they both say, in payment of money which Mr. Davenport owed to the defendant, and they also both say, that he wanted her to accept the conveyance as a payment of all he owed her—to call it square—but that she declined to do so, stating that she would call it square as far as it went, that is, that it should operate as a payment to the extent of the value of his interest in the land. Mr. Davenport had in his hands, at that time, $11,500 belonging to his wife, which he had received shortly before from the sale of some real estate in the city of New York. Both mother and son say that it was understood, at the time it was agreed that the defendant should purchase the interest of Thomas Davenport and her husband in the Jersey City property, that Thomas should be paid $5,750 for his interest, and that the payment should be made out of the $11,500 then in her husband's hands. This fact, considered in connection with what, under the circumstances, would have been a very natural arrangement for the parties to make, and remembering that it is undisputed that the husband was to be paid for the value of his interest in that land by the discharge of a debt which he then owed his wife, and that no other debt was canceled, or pointed out as the one to be considered paid, there would not seem to be the least reason to doubt that, at that time, it was understood by all parties that the conveyance of the husband's interest in the Jersey City property paid the $5,750 which the husband then owed his wife.

The only evidence, standing in the slightest conflict with this view, is a promissory note, which, if truly dated, would seem to show that some fifteen months after Thomas Davenport had conveyed the Jersey City property to the defendant, her husband

recognized the $5,750 as a debt still due to her. A promissory note, made by James S. Davenport to the defendant, was put in evidence, which purports to have been made on the 29th of July, 1880, and which declares, on its face, that it was given for $5,750 received from the sale of the defendant's real estate in the city of New York, and also that the money for which it was given had been used by Mr. Davenport "in mining and other business." But, if it be conceded that this note is truly dated, and was actually given on the day of its date, it does not necessarily follow that the debt, which it purports to represent, had not been previously paid. The fact that a debtor has paid a debt, will not prevent him, if he desires to use it subsequently as a pretended consideration, from giving a note for it, or making such other use of it as to him may seem best calculated to invest a transaction, which, in its essence, is illegal, with the appearance of legality. That James S. Davenport, while planning the transfers last in date, which he made to his wife, tried to magnify his liabilities to her to their utmost proportions, there cannot be the least doubt. The proofs show, that he not only attempted to create debts against himself, in cases where he had used his wife's money with her consent, and under circumstances which show that she had no expectation, when the money was used, that it would be repaid, and that he, in using it, had no intention of incurring an obligation, but also, that he went to the length of attempting to treat the receipt of money, which he had derived through his wife, but which by law belonged to him, as creating a debt in her favor. He made out his accounts between his wife and himself in this very unusual method; he charged himself with everything he had received, but gave no credit. And he adopted this course, notwithstanding the truth was, as his wife swears, that she made drafts on his purse whenever she wanted money, and had thus obtained from him a great deal of money. She says she spent a great deal of money. And her son, James B. Davenport, swears, that sometimes his father turned over to his mother the money which he had received for her, and that in one instance she had sufficient money on hand to make him a loan of $500. James S. Davenport, in searching for debts to

serve as considerations for these transfers, manifestly intended to give effect, as a debt, to every pretence of claim, which in his view possessed sufficient apparent substance to relieve his wife, in case she was required to maintain it by her oath, from a painful consciousness that she was attempting to maintain that which she knew to be false.

But there are strong reasons to doubt whether any of the promissory notes, put in evidence, were actually made when they bear date. Five were offered; their dates and amounts are as follows: March 6th, 1874, for $8,000; August 13th, 1875, for $2,940.46; July 1st, 1876, for $7,000; July 29th, 1880, for $5,750; and October 4th, 1882, for $1,200. Each states on its face, the source from which the money, for which it was given, was derived, and also for what purpose the money had been used, except the one bearing date August 13th, 1875, and that, after giving the source, simply says, that the maker had used the money, without specifying the particular purpose. For example, the note first in date states, that it was given for a part of the money received from the sale of the defendant's house, 48 Grand street, Jersey City, and which Mr. Davenport had used in paying for the brick stores in Plainfield. Each of the others speaks with like particularity. This particularity, it must be conceded, is contrary to the course ordinarily pursued by the most cautious business men, even when they are dealing in like transactions, with persons whom they fear or distrust. Here there was no distrust, but the greatest confidence. The defendant had everything she wanted. Her husband's love for her, his success in business, the style in which he had always lived, and his standing among his associates, were such as to induce her to believe, with a faith that was sure, that she need take no thought for the future, but that he would make all the provision for her that her welfare required. So far as appears, there was not the slightest reason, at the time either of the notes purports to have been given, to fear that anybody, at any time in the future, would attempt to raise any question respecting the validity of any paper which the defendant might produce, bearing the signature of her husband. If it be said that Mr. Davenport might have adopted this unus-

Jones *v.* Davenport.

ual precaution, to prevent his wife, in case of his death, from being troubled with a suspicion that he had not dealt justly with her, by acknowledging the full amount of his indebtedness to her, it will be seen at once, that no such reason could have operated on his mind when the last two notes purport to have been made. Prior to that time he had made his will by which he gave her all he had. That continued to be his will when the two last notes were made and up to the day of his death. The notes unmistakably show, that, at the time each was drawn—and they were all drawn by Mr. Davenport himself—there was a thought in his mind, that, in each of these transactions, it was necessary for him—and the same thought seems to have been in his mind when he made the transfers to his wife—to be extremely cautious, and to make the papers furnish on their face, evidence that they were true, honest and real. Such a condition of mind would have been perfectly natural, at any time subsequent to the date when the conviction first forced itself upon Mr. Davenport's mind, that it was probable there would, at some future time, be a struggle between his wife and his creditors, as to which had the superior right to his property. After a fear had entered his mind that such a struggle might occur, he would naturally be extremely cautious, and endeavor, by the exercise of his utmost skill, to make every paper, which he prepared, furnish the very highest internal evidence that the transaction, which it represented, was honest and valid. But in the absence of such a motive, or one of like character, it seems to be almost incredible, that these five papers, executed at intervals extending over a period of more than eight years, between persons holding to each other the most intimate relations, and when there was no reason to believe that any question respecting them could ever possibly arise, should all, from first to last, be distinguished by such remarkable particularity and close attention to unusual details.

Besides, an inspection of two of the notes, drawn ostensibly with an interval of more than six years between them—I refer to the two dated respectively July 1st, 1876, and October 4th, 1882,—shows that they were written on paper of exactly the

same kind, apparently on the same sheet or leaf, and, so far as it is possible to determine by an examination made with the natural vision, by the same hand, with the same pen and ink, and at the same time. The evidence which these two papers themselves furnish, that they were made at the same time, and not more than six years apart, I regard as almost conclusive. There is no evidence tending to show that the five notes were made at the time they respectively bear date, except that of the defendant herself. She swears that they were all truly dated, but she confesses that she cannot trust her recollection of dates, and her testimony shows that her memory in that respect is untrustworthy. I am convinced that all the notes were made after Mr. Davenport became satisfied that it would not do to trust his wife's future to the provision which he had made for her as bounty, but that it would be necessary, in order to enable her to keep what he wanted her to have, that he should make it over to her as his creditor.

But the defendant's right to hold, as against her husband's creditors, the property which he transferred to her, does not at all depend on whether these notes were given at the time they bear date or not, but the transfers must be held to be valid or invalid, as it shall appear, whether or not they were made for an honest purpose, and were or were not supported by a real consideration. The fact that the notes were falsely dated does not prove that there was no debt, but it does show that one of the parties to the transaction was trying to make evidence in support of the debt, which is false. The fact is established beyond dispute that, between 1860 and 1880, James S. Davenport received money belonging to his wife amounting altogether to about $30,000. These moneys were received as follows: In 1860 or 1861, from her grandfather's estate, about $600; in 1872, from the sale of a house and lot in Jersey City, $15,000; in 1874, from the estate of James T. Bertine, deceased—Mr. Bertine had been the defendant's guardian—about $2,900; and in 1879, from the sale of real estate in the city of New York, $11,500. Mr. Davenport's receipt of these moneys made him the debtor of his wife. When a husband receives money be-

longing to his wife, the law presumes that he receives it for her use, and if he denies that he is liable therefor, the mere fact that he received it casts upon him the burden of showing that he has appropriated it according to her direction, or that she gave it to him.   This is the rule in respect to the *corpus* or principal.   A different rule prevails as to interest or income.   If he receives interest or income, and spends it with her knowledge, and without objection, a gift will be presumed.   *Horner* v. *Webster, 4 Vr. 387, 406, 411; Black* v. *Black, 3 Stew. Eq. 215, 219.*   As long ago as 1722, Lord Macclesfield declared that where a married woman held a separate estate, and her husband got possession of any part of its principal, he was bound to account to her for it, but that where she permitted him to receive the income of her estate, and to use it, without making the least objection to him, or to the debtor who paid the money, or to her trustees, it should be presumed that she consented that he should use the money as his own.   *Powell* v. *Hankey, 2 P. Wms. 82.*   The rule, as thus stated, is founded on right reason and in good sense.   A wife, by permitting her husband to take her income and make such use of it as he sees fit, induces him to live in a style much more expensive than he otherwise would.   He spends more for her, and gives her more to spend than he would if she required him to pay her income over to her.   And she gets just as much benefit, as a general rule, from his increased expenditures as he does.   It would, in many cases, not only be extremely unjust, but ruinous, if the wife could, after years of silence, call upon her husband to return to her everything he had received for her. A rule which permitted her to do so would very greatly multiply the hazards of business, and serve as a new encouragement to fraud.   The decision of these cases must, in my judgment, be governed by the principle above stated.

The sum last received by Mr. Davenport for the defendant— the $11,500 received from the sale of defendant's New York real estate—was used by her, as I think the circumstances clearly show, in paying for the interest of her husband, and that of his brother Thomas, in the property which Thomas conveyed to the defendant on the first day of March, 1879.   That conveyance

must, I think, be held to be valid. But this result necessarily invalidates the conveyance made to the defendant, of the Cornell property. That conveyance, in my judgment, is without the support of a sufficient consideration to make it effectual against creditors. The grantor, in making that conveyance, attempted to use, as a consideration, a debt which had been previously paid by the conveyance of other land. Either one or the other of these conveyances, it is clear, is without consideration, and as the first was made when the grantor was under much less temptation to attempt to defraud his creditors, than he was when he made the last, the first may be held to be honest without doing violence to the probabilities of the case, but the last cannot be. The other three conveyances, namely, of the Plainfield property, of the property on the corner of Cliff and Cedar streets, in the town of Somerville, and of the Steele property, although surrounded by a great many suspicious circumstances, and all three of which were, unquestionably, made after the grantor had made up his mind to make over to his wife all of his property for which he could discover, in his handling of his wife's money, an appearance of a consideration, must nevertheless, I think, on the proofs now before the court, be held to be valid. They seem to have the support of consideration which, under the circumstances, it would appear to be just to hold to be sufficient.

Both transfers of the bank stock must, however, be held to be fraudulent. The last was without the least pretense of an honest consideration. By the first the defendant obtained title to eighty-six shares. They were worth, according to the price at which she sold them, $15,480. The consideration she claims to have paid was only $12,479.68, being $3,000 less than their market value. Hence, to the extent of $3,000, even if the consideration she claims to have paid was real, the transfer was purely voluntary, and the transaction, in its legal essence, was a mere attempt by an insolvent debtor to put that much of his property beyond the reach of his creditors, by donating it to his wife. It cannot be said that Mr. Davenport did not know the value of the stock. He was a director of the bank which issued the stock, and had been for many years, and it must, therefore, be presumed that he

Jones *v.* Davenport.

knew the stock was selling for a price higher than that for which he pretended to sell it to his wife. The consideration claimed to have been paid for the eighty-six shares consisted of interest money and rents which the defendant's husband, during a period of over twenty years, had collected for her. Mr. Davenport, in making out the account showing a total of $12,479.68, charged himself, for interest money received, with $2,373.45, and for rents with $10,106.23. The rents were received, as the account, prepared by Mr. Davenport preliminary to the transfer, states, from houses on Sixth street and Watts street, in the city of Hoboken; on Grand street, in Jersey City, and on First avenue, in the city of New York. The charges extend over a period running from 1860 or 1861 to January, 1884. No account, kept in a book, was produced showing all the charges. An account book was put in evidence, which the son, James S. Davenport, says he saw his father using, while his father was searching for the items which make up the $11,479.68. This book contains, however, no account showing that the defendant was entitled to what she now claims. It contains an account of rents received from property on Grand street, Jersey City, from March, 1882, to May 6th, 1884, but the account has very much the appearance of not having been made as the rents were received, but all at one time. The book also contains an account of rents received from the property on Watts street, Hoboken, and other houses in which the defendant was interested, but shows also that the defendant was, in each instance, after the expenses had been deducted, paid just what she was entitled to receive. This book shows that Mr. Davenport was in the habit of making very full and complete accounts of all his transactions, and I have no doubt, unless the truth is that it was well understood between the defendant and himself, that he should be at liberty to use her income as his own and expend it as he pleased, that an account once existed, showing just what he had received for her, and also what disposition had been made of it. No such account has been produced. The defendant, on the death of her husband, succeeded, as his legal representative, to the possession of all his books and papers, and the fact that she

4

has not produced a book, containing an account, showing that the relation of debtor and creditor existed between her husband and herself, in respect to income, must, I think, be taken as conclusive evidence that none now exists. And whether an account once existed and has been destroyed, or none was ever kept, is quite immaterial, for the non-production of an account, whether attributable to the one cause or the other, must lead to the same result.

All the probabilities surrounding the case indicate, very strongly, as I think, that it was clearly understood between Mr. Davenport and the defendant that he should not account to her for income further than to furnish her, from time to time, such parts of it as she might desire. This conclusion is made almost absolutely certain by the fact that when he came to furnish her with written evidence of his liability to her, he gave her notes simply for the principal sums, and not for interest and rents, and that she accepted the notes without claiming or intimating, in any way, that she was entitled to anything more. The deduction to be made from this fact is substantially the same, whether the notes are regarded as truly dated, or as having been made long subsequent to the time when they bear date. Whether truly dated or not, they furnish very strong evidence that at the time they were made, the defendant did not regard her husband as her debtor for income, and that he did not regard his wife as his creditor on that account. The relation of debtor and creditor, in respect to income, was not attempted to be created, as the conduct of the parties for the whole course of their married life fully demonstrates, until Mr. Davenport was persuaded to believe, by the importunity of his son-in-law, Hugh N. Hartwell, that it was his duty to make over his bank stock to his wife, and thus prevent his creditors from seizing it. Both transfers must be declared invalid as to creditors.

The defendant is personally answerable for the sum which she received from the sale of the stock. She sold it after she had proved the will, and had thus become trustee for her husband's creditors. She has appropriated to her own use moneys which, in the proper discharge of her duty as executrix, she should have

Jones *v.* Davenport.

applied to the payment of her testator's debts, and she must, in consequence, answer out of her own estate for her *devastavit.*

The defendant, both by her answer and on the argument, disputed the right of the complainant Jones to maintain his action, on the ground that Jones being a judgment creditor, and it appearing by his bill that he has not exhausted his remedy at law against the person against whom his judgment was recovered, he is not in position, as against either the estate of a decedent who is liable for the debt on which his judgment is founded, or the fraudulent grantee of such deceased debtor, to be entitled to the aid of a court of equity.   The bill of Mr. Jones does allege that he has recovered two judgments at law against Thomas Davenport, one against him as an individual and the other against him as the survivor of Davenport Brothers, and also that executions have been issued and levies made thereunder on lands which Thomas Davenport had conveyed away before his judgments were entered, and that the lands so levied on are not adequate in value to pay the judgments.   This averment shows, by unavoidable implication, that the lands levied on have not been sold, and consequently that Mr. Jones has not, as against Thomas Davenport, exhausted his remedy at law.   On an application to amend the bill in this particular, it appeared, however, that the averment, that levies had been made under the executions, was not true, but that the truth is that both executions had been returned before the bill was filed, with statements showing that no property could be found on which a levy could be made.   But allowing Mr. Jones's bill to stand in its original form, I know of no reason why he may not maintain his action.   He is not before the court as a judgment creditor.   He has no judgment against the defendant, nor against the testator, whom she represents, nor is he entitled, under his judgments, to execution against the property of either.   He sues simply as a creditor of James S. Davenport, deceased.   The only advantage that can possibly accrue to him from the fact that he is a judgment creditor of one of the persons who is liable for his debt, is that he may, under some circumstances, in a proceeding against his other debtor, use his judgment for the purpose of establishing the amount of his

debt. But he is before the court, in this case, simply in his character as a simple contract creditor of James S. Davenport, deceased, attempting to enforce the lien which the statute gives him for his debt, on the lands of which his debtor died seized. That such lien is sufficient to enable him to maintain an action in equity, to invalidate a conveyance of land made by his debtor in fraud of his rights as a creditor, is authoritatively settled in this state. *Haston* v. *Castner, 4 Stew. Eq. 697*. The fact that Mr. Jones is attempting, by legal process, to compel another person, liable for his debt, to pay it, neither destroys nor suspends his right of lien, but his right in that respect endures in full vigor until his debt is paid, or his right of lien is discharged by an alienation of the land. In my judgment the right of the complainant Jones to maintain his action is clear.

As already stated, there are three different classes of creditors before the court, and, as is obvious, their rights in the property which, under the decrees to be made in these suits, will be declared to be the assets of James S. Davenport, deceased, for the payment of his debts, are entirely different. While the rule which must govern the distribution of the assets among them, is perfectly well settled (*Davis* v. *Howell, 6 Stew. Eq. 72 ; S. C., on appeal, 7 Stew. Eq. 292*), neither of the bills asks to have the assets marshaled, nor, as I understand the practice, can any direction upon that subject be given under the pleadings as at present framed.

The complainant in the first suit is entitled to a decree setting aside the deeds of the Cornell tract, with costs, and the complainants in the two other suits are entitled to a like decree as to those deeds, and also to a decree nullifying the transfers of the bank stocks, with costs.