THE KNICKERBOCKER TRUST COMPANY

*v.*

EDMUND H. CARHART and DIANA B. CARHART, his wife.

[Submitted August 18th, 1906.   Decided September 4th, 1906.]

1. Defendant, prior to signing an underwriting undertaking, was seized in fee of certain real estate and was a tenant for life of a town house. Just prior to the maturity of his underwriting obligation he conveyed all of his real estate to his wife, leaving him unable to pay a judgment recovered by complainant on such undertaking.—*Held,* that such facts were sufficient to establish a *prima facie* case that the conveyances to the wife were fraudulent.

2. A voluntary appropriation by a wife of her money to the improvement of her husband's homestead in general indicates a gift to the husband on condition or expectation that the wife will be entitled to occupy the property during their joint lives.

3. Where a wife received the proceeds of a tontine insurance policy on the life of her husband which matured during his lifetime, and later contributed more than the amount of such policy to the improvement of the homestead in which he held a life estate, the excess so contributed constituted a valid debt of the husband to the wife which she was entitled to secure by taking a conveyance of his property.

4. After a wife had collected the proceeds of a tontine policy on the life of her husband which matured during his lifetime, she contributed more than the amount thereof to the improvement of the homestead at his solicitation, and thereafter advanced $2,000 to a limestone company in which he was interested, which he guaranteed.—*Held,* that such conveyance as against the husband's creditors was not fraudulent, but was enforceable as a mortgage, having priority over complainant's judgment for the amount of the husband's debt to his wife.

---

On final hearing on bill, answer and proofs.

*Mr. George G. Tennant,* for the complainant.

*Mr. William H. Morrow,* for the defendants.

PITNEY, V. C.

The bill is filed by the Knickerbocker Trust Company, a judgment creditor of the defendant Edmund H. Carhart, to set aside, as against its judgment, a conveyance made by Carhart to his wife, the defendant Diana B. Carhart, on the ground that the same is fraudulent and void as against its judgment.

The complainant makes out a *prima facie* case as follows: On the 6th day of March, 1904, the defendant Carhart underwrote an undertaking, with the North Hampton Railroad Company to the complainant trust company, to pay $7,500 in six months, with interest, and receive, upon such payment, $10,000 of the bonds and $5,000 of the stock of the railroad company. This undertaking is the basis of the complainant's judgment against him.

At and for a considerable period of time previous to the signing of this undertaking Carhart was seized in fee of two small pieces of unimproved and unproductive real estate, and of a lot upon which stood a dilapidated and barely tenantable dwelling, all situate in or near the town of Belvidere, in Warren county. He was also the tenant for life of a comfortable residence in that town, which had cost, first and last, $12,000 or more, but which was actually worth, either for sale or measured by its rentable value, not over $7,000.

He was fifty-one years old and in delicate, if not feeble, health, having suffered many years with chronic heart disease.

Subsequently, on the 4th of August, 1904, just prior to the maturity of his obligation to the complainant, he conveyed all this real estate, through an intermediary, to his wife.

This makes out the *prima facie* case for the complainant.

Mrs. Carhart meets this case by offering proof of a full consideration for the conveyances previously passing from her to her husband.

The consideration of this defence leads me into the history of the married life of the defendants, a large part of which was

brought out on cross-examination, against the objection of the counsel for the defendants.

Mr. Carhart was, in his young days, engaged in the clothing business in New York City. He was a member of a firm, and though, owing to ill health, he withdrew from active business about 1886, when he was a little over thirty years old, he was unable to withdraw all his capital and profits and wind up his financial affairs until several years later.

He returned to his natural home in Belvidere and resided there with his parents.

In May, 1886, he purchased from the heirs of the late Colonel James M. Robeson that gentleman's homestead in Belvidere. This is the property in which he now has a life estate. The purchase price mentioned was $8,000. A part of this consideration was real estate conveyed by him to the Robesons.

This house and lot he almost immediately conveyed to his brother, Theodore, in trust for his father and mother and himself during their joint lives and the life of the survivor, and at the death of the last survivor, to the heirs-at-law of the grantor, the defendant Edmund, in fee.

Upon the death of his brother, Theodore, his heirs-at-law conveyed this property to the defendant Diana upon precisely the same trust, so that it is proper to say that prior to the deeds of August 4th, 1904, she had and could have no personal interest in the property except that which a wife has in property in which her husband is a life tenant, and where her own children are the expectant remaindermen.

Shortly after Mr. Carhart retired from business he purchased a farm near Belvidere and two pieces of productive real estate in that town.

Afterwards, on the 21st of August, 1889, he married the defendant Diana, whose maiden name was Belford.

She was then two or three months short of twenty-one years of age, and was entitled to about $2,500, as her share of her mother's estate, who had been dead several years. In addition to that little fortune, her father settled upon her a wedding present of $1,500 in the shape of securities, which were placed,

as I interpret the evidence, in the hands of her guardian, who was her uncle.

Shortly after the marriage her husband made her a present of divers securities, amounting in value to $15,000 or more, most of it being in first and second mortgage bonds of the Wabash railway, the remainder in the bonds of a water company and stock of the Pennsylvania Railroad Company. These personal securities she always kept by themselves in her own strong box, and collected the dividends and coupons. She opened an individual bank account shortly after she was married and kept it up from that time down, and a copy of it was produced and put in evidence showing the deposits and the drafts, and in almost every instance the name of the party in whose favor the draft was made, and also the daily balances. Almost all of the original vouchers were lost.

In the year 1891 her husband conveyed to her all the real estate which he had previously purchased, as above stated, except the three pieces of insignificant value heretofore mentioned.

In addition to the land so conveyed to her in 1891 through a third party, one Young, and so called the "Young deed," her husband purchased for her in April, 1892, the Pratt farm near Belvidere, for the consideration of a little over $9,000. Of this consideration her husband advanced all above $6,000, as shown by her bank account. She gave a mortgage for the remaining $6,000, holding the Wabash bonds for an advance in value. She afterwards sold enough of them to pay this mortgage.

When the defendant Carhart purchased the Robeson house he gave upon it a mortgage to two gentlemen named Hixon for $2,000, and in 1892 he induced his wife to take an assignment of that mortgage from the Hixons, which she did, paying for it with the proceeds of the sale of some of the very securities which she received as her share of her mother's estate, and taking an assignment of the mortgage from the Hixons to her.

In the meantime the defendants were occupying the Robeson house with the elder Mr. Carhart, as its tenants for life, and a strong attachment arose between the latter and the defendant Diana and continued down to his death, which occurred very recently.

Several years before his marriage Carhart had taken out a tontine policy of insurance upon his life in the Equitable Life Insurance Company. This policy he had a long time previously assigned to his father and mother. After his mother's death and after his marriage and after his father had become attached to his wife, as already stated, and not long before the tontine expired, the father reassigned the policy to his son upon the condition and understanding that if his wife, the defendant Diana, was alive at its maturity she should have it, otherwise it was to go over to the Carhart family. It matured in September, 1904, and on the day of its maturity Carhart and his wife went to New York and received the proceeds, which amounted to $6,423.75. The check given to the husband was immediately endorsed over to the wife, and deposited in the bank to her credit on the 6th of September, 1904.

Of this sum she shortly after drew $1,250 to the order of her husband, who loaned it out on interest in small sums to residents of Belvidere, taking the notes in the name of his wife.

Later on, in the winter of 1895, the husband and wife decided to make some improvements in the house, modernizing it and rendering it more comfortable and roomy. Plans and specifications were drawn by one Kimenour and he entered into a contract to do the work for $2,771. Later on a supplemental contract was made for additional work amounting to $329, making in all $3,100.

The fact was that no architect besides Kimenour was employed, and he took the contract for much less than he could afford to do it, and after nearly $3,000 had been paid him he threw the work up and the job was finished by small sub-contracts and day's work, and the whole job cost over $7,000, though it would seem that the amount paid Kimenour was more than he actually put into the house.

In May, 1895, about the time that the work on the house was commenced, Mr. Carhart induced his wife to cause the Hixon mortgage to be canceled, and for that purpose they procured from the Hixons, who lived in Belvidere, a receipt of that date and authority to cancel the mortgage of record endorsed on the mortgage. This would seem to have been required by the clerk

of Warren county, although the Hixons had received their money more than two years previously. At the same time Mrs. Carhart signed a similar document endorsed on the back of the assignment. I will quote it:

"BELVIDERE, N. J., May 20th, 1895.

"Having received full satisfaction on the within-described mortgage, I hereby authorize and direct the county clerk to cancel the same of record.

"DIANA B. CARHART."

In point of fact, however, nothing was paid by the husband to the wife at that time, and the bond, so far as appears, was not delivered up, so that the debt was not, in point of fact, satisfied. Moreover, both of the parties swear that the husband promised the wife that he would repay her the money whenever she called for it, with interest. He never has repaid the principal nor any interest on it.

One other small transaction may be mentioned here. After the receipt by the wife of the six thousand and odd dollars from the life insurance company she loaned to her husband $2,081.25, which he invested in a small speculation on his own account in Ontario and Western railroad stock which he held for about two months and sold out at a loss, and deposited to his wife's credit what remained, namely, $1,856.25, showing a loss of $225.

I may as well say here that the amount paid by Mrs. Carhart out of her own bank account for the improvement on the house and grounds in the year 1895, which was nearly all used by the husband in paying bills for work on the house, together with the item of $225, exceeds the amount of the sum she received from the life insurance policy by nearly $1,000, the precise sum can be made up from the statement furnished by counsel for the defendants, the items of which are well established by competent evidence.

In giving this history of the affair so far I have relied upon the evidence of the two defendants. Their evidence stands uncontradicted by any other evidence, either oral or documentary, and is sustained by such documentary evidence as has been produced and by the circumstances. For instance, at the time that the Hixon mortgage was assigned to Mrs. Carhart, I can conceive of no object that Mr. Carhart could have had of procuring

its assignment to his wife if he himself had paid the money to the mortgagees. He was not at that time engaged in any business, nor was he expecting to be engaged in any business except that of looking after his wife's real estate in and about Belvidere. The "Young deed," settling his previous holdings of real estate upon his wife, was dated November 30th, 1891. The purchase of the Pratt farm was April 1st, 1892. Towards this, we have seen, Carhart advanced a trifle over $3,000 and the wife gave her mortgage for the balance. Now, the Hixon mortgage was assigned on the 30th of December, 1892, nine months after the purchase of the Pratt farm, and there is little probability that Mr. Carhart had in the meantime come into possession of sufficient money, from the winding up of his New York business, to pay the Hixon mortgage. Then the reason given by the defendants for satisfying the mortgage in 1895 is a reasonable one, namely, that they had a pride not to have a mortgage upon the record standing against the homestead house and lot which they were beautifying and rendering somewhat showy.

The fact that much more than the amount of the insurance money was spent on the house shows that none of that money was appropriated to the payment by the wife of the Hixon mortgage debt. The husband was under contract to pay the contractor $3,100 and had already borrowed from his wife $2,081.25 for use in his speculation in Ontario and Western railroad stock. His bank account shows that he had no balance at that time or other available funds except what he obtained from his wife.

Counsel for defendants contends that the proceeds of the life insurance was, properly speaking, under the circumstances, the property of the wife, being in effect a gift to her from her father-in-law. This may be true, and yet it may not follow that a debt from the husband to the wife arose out of her application of it to the improvement of the dwelling. The general rule is that the voluntary appropriation by a wife of her money to the improvement of the husband's property indicates a gift. *Black* v. *Black, 30 N. J. Eq. (3 Stew.) 215.* But it is a gift upon condition, or rather in expectation, that she will be entitled to occupy it as his wife during their joint lives. But I am not aware that that implied condition or expectation has ever been or can be used as

the basis of a right to turn what was originally a gift into a debt as against creditors. In the present instance there is no evidence tending to show that there was any promise by the husband to repay the large sum of money which his wife put in their home.

Counsel for defendants contends that no promise on the part of the husband to repay moneys which he has received from his wife is necessary in order to create a debt, since the cases of *Cole* v. *Lee, 45 N. J. Eq. (18 Stew.) 779,* and *Adoue* v. *Spencer, 62 N. J. Eq. (17 Dick.) 782.* It must be admitted that those cases, especially the later one in *62 N. J. Eq. (17 Dick.) 782,* do dispense with an express promise on the part of the husband to repay the wife, although the later opinion was based upon a complete misapprehension of the evidence and the facts in the case. (I say this because when the cause came back for a new trial a careful examination of the evidence taken at the first hearing, as well as of that taken at the second hearing, and of long accounts stated and of hundreds of vouchers of various kinds, failed to disclose the least evidence that the husband ever received or had in his hands or used any money or other personal property or its proceeds belonging to his wife or which came to her by gift, devise or descent or otherwise whatever.)

But in the present case I think that the evidence shows that the costs of the improvements, so far as they were covered by the insurance money, are outside the rules laid down by that case.

My inference from all the evidence and the circumstances is that, as it clearly appeared that when the undertaking was commenced both parties believed and understood that the proceeds of the life insurance would be more than enough to pay for the proposed improvements, the defendants both understood that no debt should arise from the husband to the wife on account of it. But in this they were disappointed, as we have seen. Now, the husband had the management of all that matter. The contract was in his name. He made all disbursements. It was his duty to know and see to it that the cost did not exceed what I will call the appropriation, and it was his fault that it did so exceed. I doubt if the wife was even aware that she was paying out so much money. Under these circumstances I deem it simple justice that the excess of the cost of the improvement over the

amount of the insurance should be treated as an honest debt from the husband to the wife, and that so far the rule in *Adoue* v. *Spencer* applies.

We come now to a period eight years later, in 1903. In or about that year a few gentlemen in Eastern Pennsylvania formed a little corporation called the Easton Quarry and Limestone Company, which became the owners of what they thought was a valuable limestone quarry, and proceeded to attempt its development. To that end they invited Mr. Carhart to act as a director and as its secretary, at a salary of $2,000 a year, and qualified him by issuing to him a share of stock. He acted as such secretary for a few months, and as long as there was any work for him to do for the company in that or any other capacity. The enterprise was a failure, although, so far as appears, the company never became insolvent. It was simply unable to make sale for its product, and it never paid Mr. Carhart one cent of salary.

In the meantime, however, it did need money for current expenses, and borrowed money of Mrs. Carhart to the extent of $2,000. To raise this money she sold two Wabash bonds, or other securities, apparently one at a time. Her bank account shows that on September 3d, 1903, she is credited with Brown Brothers & Company's check for $1,140, and on the 5th of September she drew her check, to the order of the Easton Quarry and Limestone Company, for $1,000, and received in return the company's note, dated September 5th, 1903, for $1,000, for one year, with interest at five per cent. A good deal of time and space in the stenographer's notes was taken up on April 12th, 1906, the last day of the taking of the evidence, trying to determine how the second $1,000 was paid to the quarry company. Mr. Carhart thought that the amount was paid either by currency or by the check of a broker or brokers for securities. On the 4th of June, 1906, the day of the argument, the question was settled by the production of the check of Hackett & Chidsey, brokers, of Easton, dated October 7th, 1903, for $1,132.50, to the order of Mrs. Carhart, endorsed by her over to her husband, and again by her husband, which shows the consideration for the

second note, which was dated October 8th, 1903, for $1,000, at one year, with interest at five per cent.

Now, both of the defendants swear that the contract between them at the time the money was advanced was that the husband should take care of the wife in the transaction, and make the notes good to her or take them off her hands. It is to be observed that she did not meet any of the other officers of the quarry company; that her husband solicited the loan from her, and it was natural and proper that he should guarantee it to her.

Now, as before remarked, I believe their evidence. Their manner on the stand inspired confidence. Both seemed entirely willing and desirous to be truthful in their evidence.

We come now to the circumstances of the making of the conveyance which is impeached. The husband had been engaged in no business, since the marriage, requiring any capital, business tact or judgment. His health was delicate. He seems to have busied himself with looking after his wife's farms and real estate, and occasionally buying and selling a little produce. His judgment as to the value of the real estate which he did buy, as well that which he settled on his wife as that which he settled on his parents and himself, proved to be faulty, and the land became very much depreciated in value. The wife's income was scanty. She learned that he had underwritten the bonds of the nascent railroad company for a large amount. She saw that the quarry company enterprise was a failure; that he got no salary from that company, and that the notes which she took for the $2,000 loaned the company were not likely to be paid at maturity. She expressed the situation by saying that she saw "he was getting into things," and she felt that she ought to be secured. She therefore, without any conference with her husband, called on Judge Morrow and consulted him more than a month before the maturity of either her husband's obligation to the trust company or the quarry company's notes. And here it is proper to say that she was not expecting that her husband would certainly lose the amount that he had underwritten to the trust company. He had been led into that transaction by two gentlemen who were named in the evidence, and who, as she understood, had agreed to indemnify him. However, she called on

Judge Morrow and gave him, sooner or later, all her papers and vouchers, and instructed him to devise means to secure her. The result was that the judge ascertained from the county records what available assets her husband had, including his life estate in the old homestead, and footed up from the documents (many of those connected with the addition to the homestead were found among the papers of the late H. S. Harris, who attended to the settlement of the accounts with Kimenour) the amount which he, as a lawyer, concluded that her husband owed her, and found that it far exceeded the aggregate value of the real estate which the husband owned in fee-simple and the value of his life estate in the homestead, and so he concluded that her proper remedy was to take a deed of conveyance absolute from her husband for all those properties.

He then called her husband into his office, went over the matter with him, and the husband found the judge's statement of the matter correct, and acceded to his request to make a conveyance to his wife. This was done through a third party on the 4th day of August, 1904, a month before the maturity of her husband's obligation to the complainant, and before the quarry notes matured.

She procured the deed to be recorded, and at the same time endorsed over without recourse the two quarry company notes to her husband.

Now, I hold that the consideration for that deed was good to the extent of the $2,000 Hixon mortgage, the $2,000 of the quarry company's notes, and between $800 and $900 for the excess of the cost of the improvements put upon the homestead over the amount of the life insurance money, the whole sum amounting to nearly $5,000, without allowing any interest on the earlier items, and without allowing some small repairs subsequently paid for by the wife, and without allowing for taxes and insurance paid by her for several years upon the homestead, all of which are claimed by the wife.

Against this result counsel for complainants (besides making a severe attack upon the credibility of defendants as witnesses, which I have already met to my own satisfaction) urges that the court, in dealing with the case, should take into consideration

the result of a decree in favor of the defendant, namely, that the entire fortune of the husband will become vested in the wife, resulting in his having the substantial benefit of it.

This point is not without force, but I think it is not sufficient to alter the result.

The original settlement by the husband of most of his property upon his wife was made at a time when he neither had any creditors nor expected to have any. He did not contemplate entering upon any hazardous pecuniary enterprises, and he did not, in fact, enter upon any until 1904, more than ten years after the settlement, when he was drawn into this railroad syndicate, and then only upon being, as he supposed, indemnified. It does not appear that he, at any time, held himself out as or put on the least appearance or assumption of being a man of property. The situation of the title of all the property which he owned or ever had owned appeared clearly by the public records. In fact, the title to the land settled on the wife shortly after their marriage was not attacked by the complainant, nor indeed could it be with the least prospect of success. Under these circumstances I am at a loss to perceive how I can treat the case otherwise than I would treat it if none of the wife's property had come from the husband, unless it be in the matter of interest, which I have not found it necessary to determine.

Again complainant's counsel argues that the conveyance in question cannot stand because it was made for the purpose of defeating the complainant's claim.

Leaving out of view the circumstance that it was supposed that the husband would be protected against that claim by his indemnifying friends, there is nothing to show that the object of the wife in the transaction reached any farther than the securing herself. She may, indeed, have been aware that the result of so securing herself would be to defeat the complainant's claim, but that condition of mind is not sufficient to defeat the conveyance. This principle is fundamental. Otherwise few deeds made to give a friendly creditor priority could stand against other creditors. Clearly the argument put forward by counsel for complainant would lead to the abrogation of the well-established rule in New Jersey that a debtor may prefer a creditor.

The present case is entirely distinct from that class of cases of which *Green* v. *Tantum, 19 N. J. Eq.* (*4 C. E. Gr.*) *105; S. C., 21 N. J. Eq.* (*6 C. E. Gr.*) *364,* is an example, where the conveyance, though founded upon an actual and full consideration, is part of a scheme to enable the debtor to withdraw his property from the reach of his creditors and enjoy it himself. Another example is where a party, with his own ready money, buys out a business establishment, as, for instance, a store full of merchantable goods, and knows that the owner is heavily indebted, and intends to abscond from his creditors with the cash in his pocket.

It is true that the result of sustaining this conveyance will probably be to enable the husband, as a member of his wife's household, to enjoy, so to speak, the life estate which otherwise would go to the creditor. But against that consideration comes in the other result, namely, that it will enable the wife to enjoy what she has paid for and justly acquired, and from the enjoyment of which a contrary decision would deprive her during her husband's lifetime. The fact that the husband will probably remain a member of his wife's household does not, and, in my judgment, should not, deprive her of the right to enjoy her own.

The result is that I hold that the only right of the complainant is to have that conveyance declared a mortgage, with priority over its judgment, to secure the wife the sums of money I have above mentioned, with the right to redeem the same with interest from its date, costs included.

If complainant does not desire to accept that remedy its bill will be dismissed, with costs.

If it shall exercise its option to have the deed declared a mortgage, I will make up from the evidence before me the precise amount in which the husband became indebted to the wife for moneys paid to go into the building in 1895.

If the complainant does not care to accept the only remedy I can give it it is not worth while to incur any farther labor in the cause.