The complainant prays for an accounting and the specific performance of an alleged partnership agreement between him and the defendant. At the time of the institution of this suit the parties were husband and wife — having been married October 26th, 1941. However, a decree of divorce was sought and obtained by the defendant in the State of Florida on or about March 24th, 1947, after the complainant contested the suit.
At the time of their marriage the complainant conducted a small business on Mott Street, New York, dealing in distress and auction merchandise. The defendant at the time operated *Page 4 
a women's wear business with her brother-in-law, in Elizabeth, New Jersey. The parties hereto became acquainted in December, 1940, in the course of a business transaction, which resulted in the sale of the defendant's store in Summit, New Jersey, to the complainant. Thereafter a friendship developed between them which resulted in their marriage. The defendant had been a widow with two young children.
The defendant purchased her brother-in-law's interest in the Elizabeth store for the sum of $3,700. The complainant now claims a one-half interest in this business. He says that while he and the defendant were on their honeymoon they decided to form a partnership; that upon their return they visited the defendant's Elizabeth store, and that while the defendant was examining business records, he, the complainant, went into a back room of the store and there prepared the following memorandum, which he declared the defendant signed (Exhibit C-1):
"November 3, 1941.
Received from my husband $2500.00 cash (Twenty-five Hundred Dollars) to enter as half business Partner with me in my store known as the Princess Charlotte, 29 Broad Street, Elizabeth, N.J. We both agree to cooperate fully in the store or any other business propositions we may desire to enter into upon the same arrangements during our married life. It is agreed that I should take care of all financial end of the business and all cash incomes and also our personal money matters at home.
ANNE."
His testimony was that he called the defendant on November 3d 1941, stating that he was coming over to see her, and she replied she would wait for him. He said, "I stood there with her, and she showed me * * * the day's receipts," and "I says, `Well, have you got a paper or something so I can make out an agreement?' She says, `Go into the back of the store — you will find some paper.'" He said he went there and "made out the receipt there, the agreement, and I brought it out, and I says, `Here, Anne, look it over. Is it suitable to you?' She took it and read the agreement. And as a matter of fact, she corrected my English. She says, `Your English is very bad, the spelling.' I says, `All right, correct that,' and she signed it `Anne.'" The complainant *Page 5 
further testified that thereupon he took the paper, folded it up, and put it in his pocket. "We kissed each other," he saying, "`let's go out and have a drink,' and we celebrated." (R. 12.)
He further said (R. 14): "Well, unfortunately, I had that paper, and we were invited * * * to my family for dinner," where, Grafman, his brother-in-law, "who is a business man," said to him: "`Now, that you are married a week, tell me, is there anything in writing to prove that you are a partner, that you gave her money and everything, and you are a partner?' I took out the receipt which I had in my pocket and I said, `Read that.'" That thereafter, "Unfortunately * * * this agreement was folded up between the papers and I tore it. When I got the papers ready to throw into the waste basket I noticed the top of the agreement torn between the papers. So I took it out and threw the rest of them away and I folded it up and put it back in my pocket." He said that he had carried the writing (Exhibit C-1) in his pocket for two or three weeks (R. 97), and that after tearing it, he collected the parts and placed them in a book in a secretary. (R. 15.)
The paper Exhibit C-1 is in three parts which are now pasted or glued together. The two upper segments contained the alleged agreement, while the lower or third segment contains only the name "Anne."
It is admitted that the writing in the two upper segments above the name "Anne" is the writing of the complainant, and that the signature "Anne" is that of the defendant. One of the main points in dispute is whether or not Exhibit C-1 was in one piece when the same was allegedly signed by the defendant.
The complainant's expert, Pelletreau, testified that it was. However, I was not impressed with his testimony. He was asked the question — "Did you ask the author of that paper whether it was folded before or after?" and he answered "No." He was further questioned — "Now, just pass no opinion, just answer yes or no. Did you or did you not ask Mr. Friedlander anything at all about this paper?" and he answered "No." (R. 340.) He stated that it did not strike *Page 6 
him as a suspicious circumstance that the paper was torn into three separate parts. (R. 339.) He also testified that the very first time he put the paper under his microscope, he discovered that the paper was folded before any writing was placed on it. (R. 340.) This statement is contradictory of the testimony of the complainant who said, "I took the paper and folded it up and put it in my pocket." (R. 13.)
I am satisfied that the fabrication of the Exhibit C-1 is shown in the demonstrations and the analyses of the defendant's expert, Haring, and by the defendant's testimony. Haring made photographs of the disputed paper. He produced and used his microscope, magnifying glasses and various measuring instruments in explaining his deductions to the court. His testimony is definite, clear and convincing. He appears to be a man of exceptional skill and ability. He examined the paper with great care and in much detail. He declared that "the ink line as recorded on the top portion and the middle portion runs out when it comes in contact with the vertical folds or creases in the paper * * * that the ink ran out in that folded section, showing the writing was put on afterward." (R. 290.) He placed his microscope in the signature area and indicated that a crease was made through the name "Anne." He examined the intersection of the crease and the ink writing and he observed that the ink writing, instead of running out, was fractured; that this took place between the letter "n" and the letter "e" in the name "Anne," declaring that the ink writing was put on the paper before the crease or fold was made, and that the writing on the upper two segments was done after it was folded. (R. 210, 212, alsoExhibits D-1, D-2 and D-3.)
He then continued (R. 210):
"The microscope shows in large form where the crease is in the paper, and it shows that the ink line of the `t' crossed and the initial stroke of the `t' run out at that intersection, showing that the ink was placed on the paper after the crease had been made therein, as it is now set up. May I add, what I am focusing, that intersection, is typical of all of the other intersections of pen and ink lines with relation to the two verticle folds which are there." *Page 7 
And further:
"* * * where the pen attacked the paper in the middle of the word `enters' and the pen came in direct conflict with the fold, causing it to split directly in the fold, again indicating that the pen and ink line was put on there after the fold was creased." (R. 211.)
He gave many more demonstrations to sustain his conclusions that the writing on the paper forming the two upper segments was made after it was folded while the signature "Anne" on the bottom segment was written before the paper was folded.
Haring stated (R. 226) — "It is my opinion that the bottom section with the name Anne on it had been torn from a piece of paper upon which certain writing had been above the name before it was torn off." He further testified (R. 225):
"Q. Now, you mentioned something a little earlier in the examination about having made a test for an ink spot in the lower portion. A. That was clearly by means of my microscope. No chemical examination was made. I did not take any chemicals to that document whatsoever. It was all a physical examination and by aid of microscope. That, in my opinion, is definitely a segment or a piece of the lower loop of the letter torn off in that portion.
"Q. And you don't find a corresponding ink mark in the upper portion? A. I do not find any."
He further testified that the ink in the signature "Anne" is older than the ink in the upper two segments; that the folds in the upper two segments do not match or correspond with the lower third segment; that the writing of the complainant is horizontal until it approaches the tear on the bottom part, whereupon it starts uphill, otherwise it would have gone over the tear and upon the third part; that the writing on the two upper segments was there before the paper was torn, and that it comprised a single paper at the time the writing was done on it. It may be noted here that the complainant who emphasized his experience in business affairs, took an old folded piece of paper to prepare such an important instrument as an evidence of his alleged interest *Page 8 
in an apparently prosperous business. Of further significance is the absence from the paper of the defendant's full name.
The defendant denies the execution of the agreement and denies that the subject had ever been discussed between them. She said that the first time she had ever seen the purported agreement (Exhibit C-1), was after the institution of this proceeding and after a day had been designated for the hearing of the issue here involved. When the alleged agreement was brought to her attention, she engaged Haring, the handwriting expert, who examined the writing and made photostatic copies of it.
The defendant points to the fact that the bill of complaint made no reference to any writing, purporting to establish a partnership relation; and not until after this suit was instituted, when she, through her counsel moved for a bill of particulars demanding, among other things, whether or not the alleged agreement asserted was oral or in writing, did she learn of the alleged writing. She says the complainant strenuously resisted answering the question whether the so-called agreement was oral or written; and that sometime prior to May 14th, 1947, there was an intimation from the complainant's counsel that there was a writing and that he was willing to exhibit the original and display a photostat of it; that on May 14th, 1947, the alleged original paper was exhibited to her and she promptly denounced it as a fraud and a forgery. She declared she never received the sum of $2,500 mentioned in the exhibit; and maintained that at the time of their marriage, and at the time of the alleged exhibit's date, the complainant had no funds whatsoever. She indicated that the complainant's business on Mott Street, New York City, was not profitable; so much so, that he was unable to finance the expense of their one week wedding trip, and to meet it, he borrowed the money from her. (R. 268.) She stated that the wedding ring used at their marriage was provided by her because complainant did not have the money to buy one. She further testified that he later stole, and sold, this ring. (R. 268.) She testified that at or about the time of their marriage she loaned complainant $275 to buy stock for his New York store. *Page 9 
The complainant in the course of his testimony said it was his practice to do all his business on a cash basis; that he kept large sums of money in a bureau drawer which was in the custody of his brother-in-law, George Grafman; that he gave the defendant $2,500 in cash to replenish the stock in the Elizabeth store at the time the defendant bought the interest of her brother-in-law; that during the years 1942 to 1944 he was employed in the Brooklyn Navy Yard, where he received approximately $60 per week, and during the course of this employment he gave his wife $650 in war bonds, and worked in the Elizabeth store in the evenings; that he traded in stocks in his wife's name under a power of attorney from her from September, 1944, to January, 1945; that a profit of $8,000 was realized in the account; that later he continued to trade until July, 1946, when the defendant nullified the power of attorney; that she gave him $2,806.75 to open a brokerage account in Florida in his own name but for their joint benefit (R. 33); that they invested in Florida real estate in 1945; that the deposit on the realty was made out of the business account; that it was his understanding that the title would be taken in their joint names. He says that he spent more than $1,600 out of his personal funds maintaining this property; that finally it was sold at a profit of $15,000; that from the fall of 1945 to the summer of 1946, he spent most of his time in Florida with his step-children and his sister, and that during the period he spent about $4,000 for food and living expenses, that about $1,000 was sent to him by the defendant as a contribution toward that expense; that from January to March, 1946, defendant lived with complainant and the children in Florida; that she returned to Elizabeth, and on July 15th, 1946, wrote a letter (ExhibitC-3), voiding the power of attorney on the stock account and prevented him from participating in the negotiations for the sale of the Florida property. He returned to Elizabeth in July, 1946, where friction and wrangling between them was frequent, and ultimately, he says, he was ordered from the house by the defendant. In the course of his testimony he stated (R. 61):
"I asked Anne what is the matter with her. She says *Page 10 
`That's all. I hate the sight of you.' She says, `If she would love me wouldn't I come down when you were there with the children? I don't like you. I hate the guts of you, and I want you to leave the house immediately.'
"* * * That's the first time in the five and a half years she ever spoke to me that way."
The defendant declared that on July 19th, 1945, she gave the complainant a check for $2,100 to open the commodity account; that on March 6th, 1946, she gave him $2,100 to purchase stock for her account; that she purchased the Florida property in the name of her employee, Anna Wolff — that the complainant was fully aware of that; that she never heard of the $4,500 that Grafman is alleged to have owed the complainant; that it was she who gave the complainant the sum of $4,500 to be deposited with the broker, Eisele King, in the early part of January, 1946; that she gave this sum in cash to the complainant as a result of a telephone call from Joseph C. Wendling, manager of the brokerage firm; that the money was taken from her safe deposit box and given to the complainant, who went to the Elizabeth Trust Company and secured a cashier's check to the order of Eisele King (R.397, 398).
Wendling, the manager of the Elizabeth office of Eisele King, testified that he considered the account in his office as belonging to the defendant; that all memoranda of transactions were mailed to her; that except for some small profits at one time, a profit of $1,500, the account generally showed a loss. He testified as to the deposit of $4,500 to the account — one item of $3,500 and another item of $1,000; that "Each time we made purchases, I spoke to Mrs. Blumberg (defendant) and discussed the security and informed her of the moneys that were needed in the account so that she could prepare herself on making payments." (R. 446.)
While Exhibit C-1 states that the complainant paid $2,500 "to enter as half business Partner with me in my store known as the Princess Charlotte, 29 Broad Street, Elizabeth, N.J.," there was not, as a matter of fact, any such shop as "Princess Charlotte" in existence on November 3d 1941. On October 15th, 1941, a certificate was filed in the office of the clerk of *Page 11 
Union County giving the name of the business located at this address as "Charlotte Sportswear."
The complainant alleges that immediately upon his marriage, or shortly thereafter, he liquidated the business which he had conducted in the City of New York, and thereafter assisted the defendant in the operation of her business in Elizabeth.
The defendant denies that the complainant ever rendered any services in her Elizabeth store; that there were no partnership accounts between them at any time, and that the complainant never possessed funds to commingle with her's. She says that out of the complainant's wages from the Brooklyn Navy Yard employment, he paid her the sum of $10 and $15 weekly and no more.
The complainant alleges that he, the defendant, and her two children, were supported by the common funds from the business. The defendant admits that they lived together but denies that the complainant supported her or maintained her and her children at any time and that throughout their married life she was obliged to support and maintain herself and her children as well as the complainant out of her own means; and that the complainant at no time ever contributed more than $10 to $15 per week towards his support as above stated. She said the complainant during his stay in Florida asked her for the sum of $5,000 to enable him to purchase a beer garden.
The defendant by way of counter-claim said that on December 24th, 1945, she withdrew $2,806.75 from her stock exchange account and delivered the same to the complainant with instructions to open a commodity account in Miami Beach, Florida, in her name. She alleges that the complainant, contrary to her directions, opened the account in his own name.
She further alleges that on January 12th, 1946, complainant forcibly entered her New Jersey residence and appropriated her furnishings and property, and refused to permit her or any of her representatives to enter the premises.
She seeks an accounting from the complainant of the moneys he obtained from her and that he be compelled to *Page 12 
vacate her residence and to return the property appropriated by him.
She claims that the complainant subjected her to abuse, oppression and brutality throughout their married life.
While the complainant testified that the memorandum of the alleged partnership was prepared in the back room of the Elizabeth store, the testimony of the defendant and her employees indicated that there were no writing facilities in that back room.
In the Florida divorce proceedings, October, 1946, heard approximately two months before the present bill was filed, the defendant was asked "Did you get a receipt for this money?" (the $2,500 mentioned in Exhibit C-1), and he answered, "I got no receipt. We agreed to get married and I got no receipt because we were going into a partnership being I put out the money." It is to be observed that Exhibit C-1 bears a date five years before this litigation.
In the summer of 1946, the complainant called at a summer camp to see the defendant's children — Daniel, aged 15 years, and Norman, a younger child. He said while there, Daniel told him "he is going to write a letter to his mother." The complainant produced a photostat of the letter allegedly written by Daniel. The cross-examination of the complainant developed that Daniel's letter to his mother was surreptitiously opened by complainant, who had a photostatic copy made of it and then replaced it in the envelope addressed to the defendant. (R. 63.) Daniel testified about the complainant's visit to him in part as follows (R.260):
"Q. Did he talk with you about any letters? A. Yes.
"Q. What did he say to you, and as a result, what did you do? A. Well, he had a letter written down, and he gave that to me and told me to copy the letter and send it to my mother.
"Q. Did you do that? A. I did.
"Q. Do you remember what was in that letter that you copied at that time? A. Well, it was telling my mother not to do anything drastic.
"Q. Did you have any idea of writing any such letter before Mr. Friedlander gave you a copy of that letter? A. No. *Page 13 
 "Q. And you copied the letter as he gave it to you? A. Yes.
"Q. And then you mailed it to your mother? A. Yes."
The younger brother, Norman Blumberg, was then called. His testimony in part was: (R. 263):
"Q. Norman, do you remember an incident in camp in the summer of 1946 when Mr. Friedlander came up? A. Yes.
"Q. Did you see anything about a letter being given by Mr. Friedlander to Danny? A. Yes.
"Q. What did you see? A. I saw Mr. Friedlander hand it to Dan.
"Q. A letter to who? A. Danny.
"Q. Did he say anything to Danny at that time? A. Just told him to copy it."
I believe the testimony of these two boys. It does not tend to reflect credit on the complainant's integrity — or motives.
The complainant's witnesses were all relatives, his brother-in-law, his niece, and his sister. Their testimony clearly appeared to be colored. I was not at all impressed with the testimony of the complainant's brother-in-law, George Grafman. He was more voluble than credible. He testified, among other things, that the complainant introduced the defendant as "his coming business partner and his wife;" and that he sawExhibit C-1 in the year 1941, before it was torn. His demeanor was not in the least convincing. "The trier of the facts is the judge of the credibility of witnesses and does not have to believe a particular witness or witnesses. A witness is not entitled to credit whose testimony is inconsistent with the common principles by which the conduct of mankind is naturally governed. * * * And the trier of the facts, whether court or jury, has the right to discredit altogether the testimony of a witness, where there is reason therefor, and to disbelieve him."Riehl v. Riehl, 101 N.J. Eq. 15; 137 Atl. Rep. 787.
Anna Wolff, the defendant's bookkeeper and manager, testified she lived with the Friedlanders until 1944; that they continually quarreled about money matters; that on one occasion complainant told her that if defendant would give him $5,000 he would leave the house; that the complainant was never considered interested in the business at Elizabeth *Page 14 
and seldom appeared at the store; that he knew the Florida property was in her name, and that on his return from his first trip to Florida he said to her, "You have property in Florida." (R. 182.)
The defendant's buyer, Bessie Winarsky, testified that the complainant came to the Elizabeth store only occasionally and that he was never recognized as a partner in the business nor consulted by her or the other employees.
Gladys Friedman, another buyer for defendant, testified that complainant came to the store after his work in the Brooklyn Navy Yard; that he took no part in the business; that she witnessed the cashing of complainant's check by the defendant; and the payment of $10 or $15 per week by the complainant to the defendant for his board and lodging. She further testified that she said to complainant (R. 186) — "Moe, you are living with her for five years, and * * * you haven't made an effort to pay any of the expenses toward maintaining the house * * * you know you don't love her. He said, `Of course, I don't. I married her for obvious reasons, and what's more * * * if she wants to get rid of me she is going to pay * * *. If she doesn't pay, I will drag her down so she is forced to commit suicide.'"
Marcus Blum, personal attorney of defendant, testified that complainant berated and abused the defendant in his presence and demanded $5,000 from her because "she had taken the five best years of my life."
The burden of establishing the allegations of the complaint by definite, clear and convincing evidence was the complainant's obligation. He did not maintain it — his testimony, I feel, was purely fictional, incredible, unreliable, and unworthy of belief. It is my opinion, based on the evidence, that Exhibit C-1 was fabricated by the complainant. I am satisfied it is a fraud. I am convinced no partnership agreement or community of interests existed between the parties hereto.
I shall advise a decree dismissing the bill. The defendant is entitled to the relief prayed for by her in her counter-claim. *Page 15