50 N.J. Super. 37 (1958)
141 A.2d 84
JULIA LOHMANN, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
FREDERICK F. LOHMANN, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 17, 1958.
Decided April 28, 1958.
*40 Before Judges PRICE, HANEMAN and SCHETTINO.
Mr. Albert L. Cohn argued the cause for plaintiff-appellant (Messrs. David & Albert L. Cohn, attorneys).
Mr. Charles A. Stanziale argued the cause for plaintiff-cross-respondent.
Mr. Raymond W. Troy argued the cause for defendant-respondent and cross-appellant (Mr. Theodore L. Abeles, on the brief; Messrs. Lum, Fairlie & Foster, attorneys)
The opinion of the court was rendered by SCHETTINO, J.A.D.
Appeal and cross-appeal are taken from a judgment of the Chancery Division. Plaintiff wife instituted a suit against defendant husband for separate *41 maintenance and for an accounting of her share of certain real estate, business partnership, mortgages, bank accounts and for reimbursements for moneys allegedly advanced by plaintiff for payment of bills.
The separate maintenance litigation was tried first and apart from the property litigation. The trial court granted a judgment for separate maintenance, entered June 27, 1956.
On May 3, 1957 judgment was entered (A) in favor of the plaintiff (1) for an accounting as to certain items: i.e., (a) for plaintiff's one-half interest in the net rents, profits and issues derived from property located at 3701-03 Park Avenue, Union City, owned by the parties as tenants by the entirety; (b) for plaintiff's one-half interest in a $5,000 bond and mortgage; (2) for reimbursement to plaintiff by defendant for one-half the advances made by plaintiff in payment of taxes and mortgage amortization, and interest for their home at 8 Hamilton Avenue, Weehawken; and (B) against plaintiff in that all other demands by plaintiff were denied. Plaintiff appeals from so much of this judgment as denies her an accounting in respect of her alleged partnership in the restaurant business carried on at 3701-03 Park Avenue, Union City, between the years of 1927 and 1953. Defendant cross-appeals from all the above-named provisions of the judgment in favor of plaintiff.
The factual contentions, counter-contentions and the testimony are in most respects mutually contradictory and are complicated by the fact that many of the witnesses seemed prone to self-contradiction. The basic facts seem to be as follows: For several years before his marriage defendant had operated a small restaurant and "speakeasy" in partnership with his brother, Robert, at 3701-03 Park Avenue, Union City. The brother died in 1924 and defendant continued the business individually.
Plaintiff and defendant were married on September 29, 1925. Prior to the marriage plaintiff was a widow with two children; Eric, born 1914, and Otto, born 1921. She was operating a rooming house at 612 Hudson Street, Hoboken, prior to her marriage and continued to operate it *42 for some years after the date of marriage. Defendant was one of her roomers. They continued to live together at the rooming house after their marriage, and the evidence would seem to indicate that they pooled their resources in joint bank accounts.
In July 1927 the premises at 3701-03 Park Avenue were purchased with mutual funds in the name of a straw-man for approximately $50,000. Simultaneously with this conveyance the straw-man delivered a deed conveying the premises to plaintiff and defendant as tenants by the entirety. This deed was not, for self-evident reasons due to the "speakeasy" business, recorded until April 1933. The property consisted of a plot and building, including a tavern on the first floor and six apartments. Part of these premises was used during Prohibition in the speakeasy operations. The rest was rented as apartments. Subsequently, an adjacent lot was purchased by both parties as tenants by the entirety for use as a parking area adjunct to the restaurant business.
In 1933, at the end of Prohibition, the premises were altered and the operation was transformed into a duly licensed restaurant and bar. In that same year the mortgage on the business premises was called in and plaintiff mortgaged her rooming house in order to help pay off the mortgage. Defendant admits that he collected all the rents from the six apartments from 1927 to 1953 when the premises were destroyed by fire. Defendant appropriated all the money for his personal use. Additionally, defendant never paid any moneys by way of rent to plaintiff on behalf of his business use of the first floor, the basement, and the parking area. The parties never lived on the business premises.
Plaintiff subsequently sold her rooming house, realizing only about $2,000 because of the substantial mortgages thereon. They purchased, by the entirety, a home at 22 Kingswood Road, Weehawken, in 1943 or 1944. This property was sold for $22,000 in 1951 and the proceeds used in the erection of their present home at 8 Hamilton Place, Weehawken. Although plaintiff had contended that defendant *43 had kept her share of the sale price of $22,000, she waived this claim at oral argument.
Thus we have the outline of the transactions which are the subject matter of this suit.
The only issue properly raised by plaintiff on appeal is her contention that, by mutual oral agreement, she and her husband have been partners in his business enterprise since their marriage. There is no doubt that plaintiff in many ways was helpful to defendant in the operation of his business insofar as she drove him on his shopping expeditions to New York and elsewhere to purchase provisions for the restaurant; that she performed some services without compensation at the establishment, and that she alone, other than defendant, had access to the money in the safe  all prior to the breakdown of this marriage. Plaintiff also claimed and she proffered corroborating testimony that defendant held her out as a partner in business as well as marriage, and many of the insurance policies as well as the income tax returns bore the names of both parties.
But her testimony as to the partnership agreement is unconvincing. There are many contradictions in plaintiff's own testimony as to when they resolved to operate as partners  before or after their marriage  so that the evidence in this regard is inconclusive at best. She is generally "substantiated" by a witness who had been reduced in employment status due to drunkenness and who was found guilty of perjury during the trial on a question not too material to the trial; her two sons; and two friends. Some of plaintiff's own witnesses contradicted her story. In addition, in the separate maintenance phase of the litigation, plaintiff did not disclose any claimed partnership but rather alleged by affidavit that the business belonged to defendant only. Plaintiff made no claim throughout the year 1954  including any reference in the separate maintenance complaint dated October 7, 1954  pertaining to the alleged partnership. In July 1955 plaintiff first made a demand for an accounting based upon the alleged partnership claimed by her to have been created in September 1925.
*44 Counterbalancing such testimony is defendant's proof by substantial testimony that defendant never held plaintiff out as a partner, and a study of the record shows that plaintiff was unfamiliar with the management and details of the business. The business bank account was in defendant's name only. All business bills were paid by defendant. The liquor license was in defendant's name only. The copies of income tax returns filed by defendant in the joint names of plaintiff and defendant do not disclose any partnership. If such existed, partnership information returns were required. None was filed.
The remaining element of plaintiff's proof on this phase of the case was the testimony referable to the insurance policies which were in their joint names. Plaintiff produced an insurance agent as a witness who testified that the business insurance policies were issued up to 1950 in the names of defendant and plaintiff. On cross-examination he admitted they had been so issued without any direction by defendant; that in 1950 defendant told him the policies were so issued by mistake and ordered the witness to change them so that defendant's name alone appeared thereon as the assured. Moreover, when the fire of December 1953 destroyed the business property, plaintiff and defendant were paid equally by the insurance companies, but defendant alone received the insurance moneys for the contents of the bar and restaurant and reimbursement for loss due to business interruption. In an affidavit dated October 7, 1954, and filed in her matrimonial part of the litigation, plaintiff referred to their joint ownership of these premises, complained that due to the fire the insurance company made a money adjustment for the loss of the business fixtures attached to the premises, but that she had received no part of that adjustment and therefore sought an accounting for her one-half interest therein.
R.R. 1:5-4(b) in part states:
"On a review of any cause * * * involving issues of fact not determined by the verdict of a jury, new or amended findings of fact may be made, but due regard shall be given to the opportunity of *45 the trial court to judge of the credibility of the witnesses." (Emphasis added)
This court has said:
"Beyond that, every intendment is in favor of the judgment under review, and we should not disturb the court's finding of fact unless we are well satisfied that the finding is a mistaken one." Capone v. Norton, 11 N.J. Super. 189, 193 (App. Div. 1951), affirmed 8 N.J. 54 (1951); 5 C.J.S. Appeal and Error § 1533, p. 262.
Although we have the power to make new or amended findings of fact, "its exercise is permissive in our sound discretion where required to do justice in the particular case." Midler v. Heinowitz, 10 N.J. 123, 128 (1952). The burden of proving the existence of a partnership was upon plaintiff, who alleged it, and she failed to carry this burden. Fenwick v. Unemployment Compensation Commission of New Jersey, 133 N.J.L. 295, 300 (E. & A. 1945); Friedlander v. Friedlander, 142 N.J. Eq. 3, 14 (Ch. 1948). We affirm the trial court's finding on this issue.
At oral argument defendant's counsel urged us to bear in mind the above-quoted principles of appellate review in determining plaintiff's appeal, and counsel  in answer to a query  conceded that the same principles apply to his client's cross-appeal.
Defendant, in his cross-appeal, contends that the trial court erred in requiring an accounting for the reasonable rental value of the tavern, restaurant and parking lot properties. He concedes that, in the event of an ouster by a tenant by the entirety, an ousted co-tenant has a right to one-half the reasonable rental value of the premises, citing Mastbaum v. Mastbaum, 126 N.J. Eq. 366, 370 (Ch. 1939), but claims no ouster or exclusion can be found against defendant.
After the trial court's first letter opinion, a more specific finding was requested from the trial court with reference to this issue. After submission of memoranda of law and oral argument, the trial court stated that:
"After full review of the law and with consideration of the particular circumstances of record, I believe defendant's assumed control *46 of the premises (held by the parties as tenants by the entirety) amounted to an exclusion, if not an ouster of plaintiff from the use of said premises for the sole benefit of defendant. See Mastbaum v. Mastbaum, 126 N.J. Eq. 366, at pp. 369, 370 (Ch. 1939). Moreover, it does not appear that the premises, particularly the business portion, was utilized at any time as the domicile or residence of either party."
We have progressed far since the days when the husband had absolute control of the premises held by the entirety and was entitled to the use and possession of the property during the joint lives of the husband and wife to the exclusion of the latter's rights. Washburn & Campbell v. Burns and McCabe, 34 N.J.L. 18, 20 (Sup. Ct. 1869); 2 Tiffany, Law of Real Property (3rd ed.), § 435, p. 232; 26 Am. Jur., Husband and Wife, § 78, p. 703. Within the last century the law concerning the property of married women has been altered so radically that the common law disabilities of a wife are almost entirely of historic interest only. 3 Holdsworth, A History of English Law (3rd ed. 1923), pp. 725-733. See notes on "Effect of the Married Women's Property Acts upon Estates by the Entirety," 37 Harv. L. Rev. 616 (1924); and also see note in 12 Iowa Law Rev. 415 (1927). In Ross v. Ross, 35 N.J. Super. 242, 246-247 (Ch. Div. 1955), Judge Goldmann stated:
"A tenancy by the entirety is a tenancy in common between husband and wife, for their joint lives, with the remainder to the survivor in fee. Each of them is seized per tout et non per my. It is well settled in this State that where title to real property is held by husband and wife as tenants by the entirety, `the wife holds in her possession during their joint lives one-half of the estate in common with her husband, and, as between themselves, the respective rights of the parties are those of tenants in common, * * *.' Nobile v. Bartletta, 109 N.J. Eq. 119, 122 (E. & A. 1931). This rule was recognized in O'Connell v. O'Connell, 93 N.J. Eq. 603 (E. & A. 1922), an action brought by the wife against the husband for an accounting of rents, issues and profits of the premises standing in both their names. The court held that ordinarily one of the rights of a tenant in common as against his co-tenant is to have an accounting of rents collected:
"The principle upon which the rule rests is that a tenant in common, in leasing the common property and in collecting the rents from the lessee, acts not only in his own right but as the representative of his co-tenants, * * *.' (93 N.J. Eq. at pages 605-606)."
*47 In Neubeck v. Neubeck, 94 N.J. Eq. 167, 27 A.L.R. 172 (E. & A. 1922), the court held that where a wife left her husband and the family domicile voluntarily and without cause, the husband was not required to pay the rental value of the dwelling house which was still being used as the family residence by the husband and son of the marriage (94 N.J. Eq. at page 172). However, as to the part of the premises which was rented out and for which the husband collected rents, the court stated that the husband in collecting the rents from the lessees, acted not only in his own right, but as the representative of his co-tenant, and that, consequently, to the extent that the moneys so collected represent the rental value of the interest of his co-tenant, "it is held in trust by him" for her use (94 N.J. Eq. at page 169, emphasis added).
Although the trial court found that plaintiff had failed to carry her burden of proof to establish a partnership and therefore had no interest in the business or profits allegedly derived therefrom by defendant, it found that defendant had assumed control of the entire premises for his sole benefit and to the exclusion of the plaintiff.
In 14 Am. Jur., Cotenancy, § 31, p. 99, we note:
"Under the ancient rule of the common law, one cotenant could occupy the whole of the common property and appropriate all the rents and profits thereof without accounting to the others, unless his acts amounted to an ouster, or unless he had agreed to become a bailiff for them. While this rule was based upon the settled principle that cotenants, though jointly seised of the entire estate, have a several and equal right of entry and possession, its injustice finally became recognized by Parliament, and the Act of 4 Anne, Chap. 16, was enacted for the purpose of changing it. This statute made any tenant in common who received more than his just share of the rents and profits liable to his cotenants for the excess; and it was no longer necessary that he should take as bailiff by appointment in order to make him responsible. The Statute of Anne has been specifically adopted in a number of states, but even where it has not been adopted, the courts frequently hold it to be applicable as having been ingrained in the common law long prior to the Revolution."
and in § 33, page 100 is found:
*48 "The question as to whether a cotenant in possession of the common property is liable to his cotenants for the value of its use and occupation, or for profits that may have accrued to him from operations thereon, is involved in considerable confusion, * * * But the courts are in unison in holding that where the occupying tenant has ousted his co-owners and excluded them from possession of the property or a part thereof, he must answer for the value of the use and occupation whether he has profited thereby or not."
In Izard v. Bodine, 11 N.J. Eq. 403, 404 (Ch. 1857), Chancellor Williamson stated the common law rule with reference to a co-tenant occupying the whole estate to the exclusion of other co-tenants:
"1. If one tenant in common occupies the whole estate, claiming it as his own, it is an ouster of his co-tenant, who must first establish his right at law, and thus recover his mesne profits  for one tenant is bound to account to another only as his bailiff appointed by contract, express or implied"
The Chancellor then pointed out the rule with reference to one co-tenant receiving the rents, issues and profits of the estate.
"2. Where one tenant in common actually receives the rents, issues, and profits, then he may be compelled to account for such profits actually received; but this is by statute, both in England and this state, and not by the common law. 4 Anne, c. 16; N.J. act of 1794, Nix. Dig. 5, Pl. 3; Sargent v. Parsons, 12 Mass. [149] 153."
In Davidson v. Thompson, 22 N.J. Eq. 83, 85 (Ch. 1871), Chancellor Zabriskie stated:
"* * * A tenant in common is not, in general, liable, unless he has excluded his co-tenant from the premises, or unless he has taken and kept possession of such premises as are not capable of a joint occupation, which is, in effect, an exclusion of his co-tenant."
In Edsall v. Merrill, 37 N.J. Eq. 114, 116 (Ch. 1883), the court said:
"This court has adopted a construction rather more liberal to the tenants out of possession. We hold, as the English courts do, that where one of several tenants occupies simply as tenant in common, *49 and not to the exclusion of the others, he is not liable to account. But we also hold that an exclusion may occur where there is no express refusal, by the tenant in possession, to allow the others to occupy, as where one of several tenants takes possession of premises which are not capable of joint occupancy; in that case his occupation is an exclusion of the others."
In Hardman v. Brown, 77 W. Va. 478, 88 S.E. 1016, 1019 (Sup. Ct. App. 1916), we note that an ouster by a co-tenant does not necessarily mean physical eviction or exclusion but means possession attended by such circumstances as to evince a claim of exclusive right and a denial of the right of the other tenant to participate in the profits. The part of the premises here occupied by defendant for his business was not used as living quarters nor was it capable of joint occupancy.
We are disturbed by one facet of this case which was neither briefed nor argued. It pertains to the second group stated above by Chancellor Williamson. The New Jersey statute referred to by Chancellor Williamson in Izard v. Bodine, supra, as "N.J. Act of 1794, Nix. Dig. 5 Pl. 3" eventually became R.S. 2:38-3. The official report of the statute reads as follows:
"III * * * That actions of account shall and may be brought and maintained by one joint tenant or tenant in common, his [or her] executors or administrators, against the other, as bailiff, for receiving more than comes to his [or her] just share or proportion, and against the executor or administrator of such joint tenant, or tenant in common." (The words in brackets were part of the original law.) Paterson, Laws of the State of New Jersey (1800), p. 140.
When the recent revision of Title 2 took place and became Title 2A, effective January 1, 1952, this statute was repealed. Nevertheless, since the repealer our courts have continued to recognize the principle permitting an accounting as enunciated by the voluminous case law since Izard v. Bodine, supra, including the 1922 opinions of the Court of Errors and Appeals in the O'Connell and Neubeck cases, supra. The cases since the repealer are: Brown v. Havens, 17 N.J. Super. 235, 241 (Ch. 1952); Mangan v. Mangan, 40 N.J. *50 Super. 99, 101 (Ch. 1956); Ross v. Ross, supra; Dorf v. Tuscarora Pipe Line Co., Ltd., 48 N.J. Super. 26, 35 (App. Div. 1957); Polombo v. Polombo, 48 N.J. Super. 13, 15 (Ch. 1957). In view of the history of this principle and its recognition over the long span of years, we are of the opinion that the law of New Jersey is settled that, in this type of case and under circumstances such as here present, a tenant in common is entitled to an accounting from the co-tenant who has collected the rents, issues and profits.
It can reasonably be concluded that these opinions "are only `evidence of what is common law'" of today, regardless of the historic statutory basis for this principle. Heise v. Earle, 134 N.J. Eq. 393, 402 (E. & A. 1944). Despite the fact that R.S. 2:38-3 was not reenacted by means of the adoption of Title 2A as of January 1, 1952, the latter statute expressly provided that:
"4. Title 2 of the Revised Statutes, as amended and supplemented is repealed, but such repeal shall not affect any right now vested in any person pursuant to the provisions of said title, nor any remedy where an action or proceeding thereunder has heretofore been instituted and is pending on the effective date of said repeal.
5. The said repeal of Title 2 of the Revised Statutes, as amended and supplemented, shall not of itself be deemed to revive any common law, right or remedy abolished by any provision of the said title." L. 1951, c. 344, secs. 4, 5.
Under a similar circumstance involving the repeal of the statute relating to the correction of illegal sentences, the late Chief Justice Vanderbilt, in the case of State v. Culver, 23 N.J. 495 (1957), commented upon the above quoted words of the statute:
"The obvious intention of the Legislature was to continue the law in its existing state except in such instances where there was express provision made for a change or some positive inconsistency was created that was incompatible with the provisions of the prior law; see L. 1951, c. 344, sec. 6." (23 N.J. at page 504.)

* * * * * * * *
"* * * One of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court. There is not a rule *51 of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night. The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Dean Pound posed the problem admirably in his Interpretations of Legal History (1922) when he stated, `Law must be stable, and yet it cannot stand still.'" (23 N.J. at page 505.)
We paraphrase an opinion of our Supreme Court in Greenspan v. Slate, 12 N.J. 426, 439 (1953), that it would shock one's sensibilities to think that the common law would permit this defendant not to account to plaintiff for the rents, issues and profits; that it reflects a point of view which is utterly inconsistent with today's common feelings of humanity, and that the courts must safeguard a spouse against such unnatural conduct by the other spouse. We therefore here find no ground for denying plaintiff her accounting. 4 Powell, Law of Real Property § 604, page 605, and § 623, pages 661, 666.
The marital discord extended back for many years. We accept the testimony of plaintiff that she had pressed defendant for moneys and an accounting over the years ever since they bought the properties; that defendant had assured her that she had nothing to worry about and that she trusted defendant. In view of the husband and wife relationship, the trial court was justified, on the unique facts of this case, in concluding that defendant's actions amounted to an exclusion. Davidson v. Thompson, supra, and Edsall v. Merrill, supra. Moreover, defendant admitted that he collected all the rents from other tenants and kept the money, and that he never paid rent for the parts of the premises used by him for his business. Cf. T.G.W. Realties, Inc., v. Long Island Bird Stores, Inc., 151 Misc. 918, 272 N.Y.S. 602 (Sup. Ct. 1934). In view of the Neubeck case and the authorities cited and quoted in the Ross case, no longer is there a doubt that had defendant here rented out the parking area, bar and restaurant part *52 of the premises to a third person and collected rents therefor, he would be required to account to plaintiff. We observe no distinction between defendant's renting out business premises to a stranger while acting as if defendant were the sole owner, and taking possession of part of the business premises as if he were the sole owner. Their actions were consistent with the time-honored concept that the husband probably has the larger share in managing the common property and that it is advisable to give him a free hand in its management since he is the head of the family. But the problem is where to draw the line so as to protect the wife and her property without unduly fettering the powers of the husband. 3 Holdsworth, A History of English Law (3rd ed. 1923), p. 521; 27 A.L.R. 184, supplemented by 51 A.L.R.2d 388, 437, 443.
But, it is clear that defendant violated the trust duty referred to in the Neubeck case, supra, 94 N.J. Eq. at page 169. In Andrews v. Andrews, 155 Fla. 654, 21 So.2d 205, 207 (Sup. Ct. 1945), we note:
"* * * the fundamental ingredient * * * of estates by the entirety, which prevents one interest holder from taking advantage of the other is their mutuality of interest and obligation. Obviously the most confidential of the relationships is found in the estates by the entirety by reason of the prerequisite of marriage. * * *
Each tenant by the entirety owes to the other the highest degree of confidence and trust."
A fiduciary cannot be permitted to use trust properties to his personal advantage and to the financial harm of the one who has placed her trust in him. In effect, the trial judge found defendant guilty of violating his trust. Murphy v. Regan, 8 N.J. Super. 44, 46-47 (App. Div. 1950); 51 A.L.R.2d 440. The testimony sustains the trial court's finding on this issue. We find no basis for the exercise of our permissive power to make a new or amended finding. R.R. 1:5-4(b); 2:5.
Finally, defendant appeals from that part of the judgment ordering an accounting for the apartment rentals from the other tenants and interest in the $5,000 bond and *53 mortgage in the name of defendant and plaintiff. The defendant claims that it is difficult if not impossible to render an accounting covering a span of 30 years; that, during that time, much evidence would have been lost or misplaced; and that the records would be incomplete. Reeves v. Weber, 111 N.J. Eq. 454, 458 (E. & A. 1932); Meyer v. Meyer, 124 N.J. Eq. 481, 486 (Ch. 1938). We feel that these feared difficulties might not arise at the hearing and we cannot presently presume to decide the problem.
On the question of plaintiff's interest in the bond and mortgage, the trial court's determination finds support in the testimony. East Rutherford Building & Loan Ass'n v. McKenzie, 87 N.J. Eq. 375, 379 (E. & A. 1917).
In the trial court's second letter opinion, he reserved several issues for the supplemental hearing on the accounting and the conclusions drawn therefrom. We are in accord with the trial court's actions.
Lastly, we refer to the violation of an appellate rule. R.R. 1:7-1 (f) states in part:
"[The] appendix * * * shall contain such parts of the record as are essential to the proper consideration of the issues, and which the appellant desires the court to read, including such portions which the appellant reasonably assumes will be relied upon by respondents in meeting the issues raised." (Emphasis added.)
Appellant's counsel, Messrs. David & Albert L. Cohn, by their violation of this rule compelled respondent's counsel to print an appendix of 103 pages containing testimony which was necessary "in meeting the issues raised." Although not requested by respondent's counsel, appellant is directed to pay to respondent the printing costs of respondent's appendix.
We conclude that, since the trial court's judgment is amply supported by the record of the conflicting testimony, we will not disturb it. Spagnuolo v. Bonnet, 16 N.J. 546, 555 (1954).
The judgment is affirmed, no costs except as stated above.
*54 HANEMAN, J.A.D.
I concur in part in the result attained by the majority, but for the reasons hereinafter expressed. I disagree in part with the result.
We are here confronted with a judgment allowing two different forms of accounting in connection with the premises known as 3701-03 Park Avenue, Union City, i.e., (1) for the rents actually collected by defendant from the tenants of the six apartments, but under neither a claim of sole title nor an ouster by defendant, and (2) for the reasonable rental value for the use and occupation by defendant of a portion of the premises as a restaurant, tavern and parking lot.
The landmark case in New Jersey concerning the liability of one tenant to his co-tenant for an accounting is Izard v. Bodine, 11 N.J. Eq. 403 (Ch. 1857). The court there held:
"1. If one tenant in common occupies the whole estate, claiming it as his own, it is an ouster of his co-tenant, who must first establish his right at law, and thus recover his mesne profits  for one tenant is bound to account to another only as his bailiff appointed by contract, express or implied.
2. Where one tenant in common actually receives the rents, issues, and profits, then he may be compelled to account for such profits actually received; but this is by statute, both in England and this state, and not by the common law. 4 Anne, c. 16; N.J. act of 1794, Nix. Dig. 5, pl. 3; Sargent v. Parsons, 12 Mass. [149] 153.
3. Where one tenant in common occupies the whole estate, without claim on the part of his co-tenants to be admitted into possession, he is under no obligation to account  for he had a right to such occupancy. Co. Lit. 200, b; Sargent v. Parsons, 12 Mass. [149] 152-153; Meredith v. Ambries [Andres] 7 Ired. 5 [29 N.C. 5]; Collum [Colburn] v. Mason, 25 Me. 434."
The judgment in the case sub judice relates to the second and third categories, as set forth in the quotation above.
I shall treat first of my concurrence, which relates to rents actually collected by defendant.
In addition to the facts recited in the majority opinion, it should be noted that the matter was tried and decided upon the theory that the apartments were leased by both *55 tenants in common and that the rents were collected by only one of the tenants.
That the common law of England prevailed in the Colony of New Jersey is not open to question. The settlers of this State brought with them the common law of England and such of its statutes as were of general application. On April 15, 1702 the proprietors of East and West Jersey made a full and unconditional surrender of the right to self-government to Anne, Queen of England. Anne accepted that surrender and appointed Lord Viscount Cornbury as Governor of the combined provinces. Under the new system of government the citizens of New Jersey claimed the protection of and were subject to the same laws as any other British subject, i.e., the common law of England, and the statutes of England which were of general application. The colonial government could, under its charter, enact laws or ordinances to govern its inhabitants, subject to the approval of the Crown and insofar as those laws did not abrogate the English law. This provision must have been designed to insure the Crown that the laws of England having general application would be uniform throughout the Empire. The colonial power to legislate was limited by charter provision to the enactment of laws which were deemed peculiarly essential to their local conditions. Those legislatures were not empowered to change the law of England save by special approval of the Crown. Thus, since 1702 the common law of England and those statutes which were general in nature were applicable in New Jersey. See Whitehead, The Judicial and Civil History of New Jersey, ch. II, p. 15, ch. VII, p. 156 (1897); Sources of New Jersey Law, 4 N.J.L.J. 69, 101, 265, 292 (1881); 5 N.J.L.J. 100 (1882); 2 New Jersey Archives, First Series, p. 489 (1881); Leaming and Spicer, Grants and Concessions of New Jersey, pp. 619, 647 (1881); Camden Trust Co. v. Handle, 132 N.J. Eq. 97, 100 (E. & A. 1942).
Moreover, there are special reasons why title to real estate and the right, benefits and duties flowing from such *56 ownership should be governed by the common law until modified by legislative enactment. It is requisite to a well ordered society that there be stability and certainty in the law regulating these rights. It is imperative in such a society that some known law be applicable. After the surrender to Anne and until the passage, in England, of the statute 4 Anne, c. 16, par. 27, the common law of England was the law which governed the rights, privileges and duties which concern the court in this case. See Camden Trust Co. v. Handle, supra.
Inferentially, at least, Izard v. Bodine, supra, is authority for the conclusion that the common law of the Colony of New Jersey, insofar as tenants in common were concerned, was identical with the common law of England.
By common law in England each co-tenant of a tenancy in common had an equal and several right of entry and possession. It followed, as a natural corollary, that each co-tenant had the right to collect rents from persons to whom all of the co-owners had leased the property. Such rents were deemed products of the land and belonged to the co-owner who collected them since, absent a statute or express agreement between the co-tenants, he did not act as agent for the others. 2 American Law of Property, 58 (1952); 4 Thompson on Real Property (perm. ed. 1940), § 1907, p. 430; Edsall v. Merrill, 37 N.J. Eq. 114 (Ch. 1883); Izard v. Bodine, supra; Mastbaum v. Mastbaum, 126 N.J. Eq. 366 (Ch. 1939).
This harsh and inequitable rule of the common law was remedied by statute (4 Anne, c. 16, par. 27) in 1705. The statute provided that:
"* * * actions of account shall and may be brought and maintained * * * by one * * * tenant in common against the other, as bailiff for receiving more than comes to his just share or proportion."
American Law of Property, supra; Thompson on Real Property, supra; Izard v. Bodine, supra.
*57 The New Jersey Constitution of 1776 provided:
"XXI. That all the laws of this province, contained in the edition lately published by Mr. Allinson, shall be and remain in full force until altered by the legislature of this colony (such only excepted as are incompatible with this charter), and shall be, according as heretofore, regarded in all respects by all civil officers, and others, the good people of this province.
XXII. That the common law of England, as well as so much of the statute law, as have been heretofore practiced in this colony, shall still remain in force, until they shall be altered by a future law of the legislature; such parts only excepted, as are repugnant to the rights and privileges contained in this charter; and that the inestimable right of trial by jury shall remain confirmed, as a part of the law of this colony, without repeal, forever."
It is therefore seen that by Articles XXI and XXII of the 1776 Constitution, provision was made for the continuance of then existing laws, i.e., (1) those statutes of the province published by Mr. Allinson, and (2) so much of those statutes and of the common law of England as were then practiced in this State.
An examination of Mr. Allinson's work fails to disclose that a statute similar to that of Anne, supra, was enacted by the Colonial Legislature.
"It was in 1792 that the legislature enacted a law providing that the governor [William Paterson] should be appointed and authorized to collect and reduce to proper form under certain heads or titles `all the statutes of England or Great Britain, which before the revolution were practiced and which by the constitution extend to this state;' he was also authorized to codify all the public acts passed by the legislature of the state since the revolution. The act also provided that the work upon completion should be laid before the legislature to be enacted into law. [An act for revising and digesting the laws of this State, passed November 24, 1792.]
Of the task thus laid upon the shoulders of the governor by the legislature, Judge Elmer says:
`This important work was entered upon, departing, however, from the plan first proposed, probably as well because the duties as judge soon interrupted his labors, and because it was more convenient to the legislature to act upon the newly prepared statutes from time to time, rather than to undertake such a work at one sitting. He continued to revise, and, as far as necessary, to remodel the British statutes proper to be re-enacted, during the succeeding five or six years, and that were from time to time adopted by the legislature as a part of the statute law of the state. In 1795 it was enacted that he be authorized, according to his discretion, to correct, and *58 modify such of the statutes which he had not reported upon and he was requested to translate the Latin and French terms as near as may be into English. It appears that he had ceased to report any new laws after 1798. * * * Upon the completion [in 1799] of the revision of the British statutes an act was passed which enacted that hereafter no statute or act of Parliament of England or Great Britain shall have force or authority within this state, or be considered a law thereof. The legislature added another section of which Paterson is not supposed to have approved, to the effect that no judication, decision or opinion, given in any court of law or equity in Great Britain, or in any cause therein depending, nor any printed or written report, or statement thereof, or any compilation, commentary, digest, lecture, treatise, or any such work, or any explanation, or exposition of the common law, made, had, given or composed since the fourth day of July, 1776, in Great Britain, shall be received or read in any court of law or equity of this state, or evidence of the law, or elucidation or explanation thereof, any practice, opinion or sentiment of the said courts of justice, used, entertained or expressed to the contrary thereof notwithstanding. * * *'" Shriner, William Paterson, pp. 19, 20 (Paterson Industrial Commission, 1940)
(The 1799 statute referred to was entitled "An act relative to statutes," passed June 13, 1799. The section to which Judge Paterson objected was modified by a supplement to that act, passed November 20, 1800, P.L. 1800-1806, Ch. XII, p. 28. On December 1, 1801 the legislature re-enacted that very provision of the 1799 act in "An act relative to foreign reports," P.L. 1800-1806, Ch. LVIII, p. 127, and in that same act repealed the offending section of the 1799 act and the supplemental act of 1800. Then on May 25, 1820 the legislature passed a new "Act relative to statutes," omitting the part objected to and providing for the repeal of all the earlier statutes mentioned above. P.L. 1820, p. 126). See Shriner, William Paterson, Paterson Industrial Commission, 1940; Schomp v. Schenck, 40 N.J.L. 195 (Sup. Ct. 1878).
In the edition of Paterson, Laws of the State of New Jersey (1703-1799), published in 1800 under the authority of the Legislature, there appears the following act passed on December 1, 1794:
"3. * * * That actions of account shall and may be brought and maintained by one joint tenant or tenant in common, his or her executors or administrators, against the other, as bailiff, for *59 receiving more than comes to his or her just share or proportion, and against the executor or administrator of such joint tenant, or tenant in common."
Paterson, Laws of the State of New Jersey (1703-1799), p. 140 (1800); Pennington, Laws of the State of New Jersey (1703-1820), p. 156 (1821).
This enactment was couched in language identical with that employed in the Statute of Anne, supra.
It is reasonable to conclude, from the fact of its inclusion in Judge Paterson's revision of the laws, that the Statute of Anne, supra, was in effect in the Colony of New Jersey from 1705 and that it was one of the English statutes which continued in force by virtue of the provision of the Constitution of 1776, supra.
For the reasons above expressed, it can be seen that the Statute of Anne, supra, was the recognized law of the colony from 1705 and was merely re-enacted or re-codified in 1794. (For academic interest, see arguments of counsel and footnote in State v. Mairs, 1 N.J.L. 335 [Reprint p. [*]385] (Sup. Ct. 1795)).
The passage of the act of December 1, 1794, by implication, repealed the Statute of Anne, supra, because by the title and enacting clause it was practically a re-enactment of the English statute and legislated upon the whole subject. In re Thompson, 85 N.J. Eq. 221 (Ch. 1915); Industrial School District v. Whitehead, 13 N.J. Eq. 290 (Ch. 1861); Bracken v. Smith, 39 N.J. Eq. 169 (Ch. 1884); Harrington's Sons Co. v. Jersey City, 78 N.J.L. 610 (E. & A. 1910).
On June 13, 1799 the Legislature passed "An Act relative to statutes" which reads, in part:
"IV And be it enacted, That from and after the passing of this act, no statute or act of the parliament of England or of Great Britain shall have force or authority within this State, or be considered as a law thereof." Paterson, Laws of the State of New Jersey, supra, p. 435.
Thus the Statute of Anne, supra, was in any event repealed. Den ex dem. James v. DuBois, 16 N.J.L. 285 (Sup. Ct. 1837); In re Thompson, supra.
*60 By the provisions of the Revision of 1877, p. 4, the statute of December 1, 1794 was re-enacted in identical language.
The Revision of 1937 re-enacted this statute in the following language (R.S. 2:38-3):
"Actions of account shall and may be brought and maintained by one joint tenant or tenant in common, his executors or administrators, against the other, as bailiff, for receiving more than comes to his just share or proportion, and against the executor or administrator of such joint tenant or tenant in common."
It becomes apparent from the foregoing historical review of the antecedent and precedent statutes, which were the genesis of R.S. 2:38-3, that the latter statute continued both a substantive right as well as a procedural remedy, existent in this State since 1705.
L. 1951, c. 344, p. 1453, provided for the adoption of a revision of Title 2 of the Revised Statutes of 1937. R.S. 2:38-3 was not enacted in that revision.
L. 1951, c. 344, p. 1453, provides, in part:
"4. Title 2 of the Revised Statutes, as amended and supplemented, is repealed, but such repeal shall not affect any right now vested in any person pursuant to the provisions of said title, nor any remedy where an action or proceeding thereunder has heretofore been instituted and is pending on the effective date of said repeal.
5. The said repeal of Title 2 of the Revised Statutes, as amended and supplemented, shall not of itself be deemed to revive any common law, right or remedy abolished by any provision of said title.
6. The provisions of said Title 2A not inconsistent with those of prior laws shall be construed as a continuation of such laws."
The failure to re-enact R.S. 2:38-3 served as a repealer thereof. We cannot speculate as to whether this was inadvertent and unintentional. The fact remains that from the very language of L. 1951, c. 344, p. 1453, par. 4, above quoted, this statute was repealed.
Nor can the language of L. 1951, c. 344, p. 1453, par. 5 be said to save R.S. 2:38-3 from repeal. In State v. Culver, 23 N.J. 495, 504 (1957) the court said:
"The obvious intention of the Legislature was to continue the law in its existing state except in such instances where there was express. *61 provision made for a change or some positive inconsistency was created that was incompatible with the provisions of the prior law; see L. 1951, c. 344, sec. 6."
Plainly, the failure to re-enact R.S. 2:38-3 was a "positive inconsistency * * * that was incompatible with the provisions of the prior law."
Under the very terms of L. 1951, c. 344, p. 1453, pars. 4 and 10, however, plaintiff is entitled to an accounting of the rents collected by defendant until January 1, 1952, the effective date of Title 2A, since she had a vested right on that date to a participation in and an accounting of the rents collected by defendant under R.S. 2:38-3. Izard v. Bodine, supra.
However, an entirely different result eventuates insofar as concerns the rents collected subsequent to January 1, 1952.
Where the letting was by all tenants in common but the rents were collected by only one, it is indisputable that the right to a participation in such rents collected, and to an accounting thereof, was a statutory and not a common law right. However, a misunderstanding of the basis of such right seems to have arisen subsequent to O'Connell v. O'Connell, 93 N.J. Eq. 603, at page 605 (E. & A. 1922), where the court said:
"* * * and one of the rights of a tenant in common as against his cotenant, who has collected rents from lessees in possession of the premises, is to have an accounting of the rents so collected. This right is so thoroughly established that a citation of authorities is hardly necessary. Among the cases in which it has been recognized and enforced are Hanneman v. Richter, 63 N.J. Eq. 753; Cole v. Cole, 69 N.J. Eq. 3; Lloyd v. Turner, 70 N.J. Eq. 425.
The principle upon which the rule rests is that a tenant in common, in leasing the common property and in collecting the rents from the lessee, acts not only in his own right but as the representative of his cotenants, and that, consequently, to the extent that the moneys so collected represent the rental value of the interest of his cotenants, it is held in trust by him for their use."
It should be observed that in the O'Connell case the husband claimed title to the entire fee and disputed the wife's *62 contention that she was a tenant by the entirety. He had occupied the entire estate as his own and ousted his wife therefrom. This was a tortious act and, as stated in Izard v. Bodine, supra, under the first of the three hypothetical situations, he must account. That the court intended no such far-reaching effect of its opinion, as is advocated in the matter sub judice, is substantiated by an examination of the cases there cited.
In Hanneman v. Richter, 63 N.J. Eq. 753 (Ch. 1902), the defendant had collected rents under claim of the entire fee title and denied, in the proceedings, that plaintiffs were co-tenants.
In Cole v. Cole, 69 N.J. Eq. 3 (Ch. 1905), the defendant was found to have been in exclusive possession of the premises.
In Lloyd v. Turner, 70 N.J. Eq. 425 (Ch. 1906), although an accounting was directed, the theory upon which such a conclusion was bottomed does not appear.
The O'Connell case is no authority for an accounting between co-tenants, absent a claim of title or exclusion. It cannot, in the light of the factual situation there present, be presumed that the court there held or intended to hold that the right to an accounting where there is no claim of title or exclusion arose other than by virtue of statute.
In the same year as the decision in the O'Connell case, the Court of Errors and Appeals rendered an opinion in Neubeck v. Neubeck, 94 N.J. Eq. 167 (E. & A. 1922). This decision was bottomed upon the O'Connell case. Again, a close examination of the contentions of the parties discloses that there was a collection of rents under a claim of title. The defendant claimed sole title to the lands involved since, although record title was vested in him and plaintiff as tenants by the entirety, he alleged that he had advanced the entire consideration for the purchase thereof and that plaintiff had forfeited her interest therein by a breach of the marriage vows.
It is therefore seen that the O'Connell case and the Neubeck case are authority only for the proposition that *63 where one tenant collects rents under a claim of exclusive title he must account to his co-tenant. Those opinions were apparently misread or misconstrued, for they were sometimes cited as authority for an accounting for rents collected in every event or circumstance between co-tenants. Sight was lost of the fact that an accounting of rents collected by one tenant under a leasing by all co-tenants was purely statutory. However, the result obtained in these later cases was proper, but by virtue of R.S. 2:38-3 and not by virtue of the cited cases.
The tocsin was sounded in Mastbaum v. Mastbaum, supra, but apparently went unheeded. There Vice-Chancellor Bigelow ably collated and analyzed the state of the law concerning accountings between co-tenants and again pointed to the statutory basis of that right in matters where the facts are comparable to those here present.
An analysis of the cases decided since January 1, 1952, which are cited by the majority as evidence that the principle enunciated in the O'Connell case has been applied where there was a collection of rents by one tenant, absent a claim of title or exclusion, demonstrates the following:
In Brown v. Havens, 17 N.J. Super. 235 (Ch. Div. 1952), the court found as a fact that "neither [tenant] received rental income from third parties."
In Mangan v. Mangan, 40 N.J. Super. 99 (Ch. Div. 1956), the court said:
"There is no doubt that generally, a tenant in common is entitled to an accounting of rents, issues and profits collected by a co-tenant who was in exclusive possession of the premises." (Emphasis supplied)
In Ross v. Ross, 35 N.J. Super. 242 (Ch. Div. 1955), the court said:
"* * * Later, by amended answer and counterclaim defendant stated that plaintiff had agreed to turn over his one-half interest in the property to her and actually did so. * * * Plaintiff demanded partition and an adjudication that the deed under which defendant claimed his interest in the property in question was a forgery. Defendant, *64 in turn, denied plaintiff ever had any interest in the realty, his name having been included in the deed because she was informed this had to be done; that following the divorce plaintiff agreed to and did convey his interest in the property to defendant; * * *."
In Dorf v. Tuscarora Pipe Line Co., Ltd., 48 N.J. Super. 26 (App. Div. 1957), the court said:
"The parties were married in 1942 and for several years lived in South Bound Brook, N.J., in premises held by them as tenants by the entirety. In October 1952 an oil leak developed in an underground pipe line near their property, owned by Tuscarora Pipe Line Company, Limited. The oil seeped into the cellar of the home, causing extensive damage to the house as well as to plaintiff's personal property. The Dorfs were compelled to move and they took up residence in Metuchen, N.J.

* * * * * * * *
This litigation resulted in a settlement and judgment for $5,250 in favor of plaintiff and his wife. It was stipulated that $2,500 of this amount was to be paid to plaintiff for the damage to his personal property, the $2,750 balance being deposited in court to await the determination of the respective parties' interest therein.
Plaintiff applied for distribution of the fund, claiming that the $2,750 should be used to repair the damage caused by Tuscarora and also to pay taxes. Defendant contended that the money should be equally divided."
In Polombo v. Polombo, 48 N.J. Super. 13 (Ch. 1957), plaintiff sought to charge defendant for expenses incurred by her for the benefit of the realty owned as tenants in common. There was no claim for any rents collected.
It therefore appears that none of the foregoing cases is authority for the conclusion that since January 1, 1952 our courts have recognized the right of a tenant to a participation in rents collected by a co-tenant, absent a claim of title or exclusion. In only one of the cited cases (Mangan v. Mangan) was the collection of rents an issue. There the court held that where one tenant was in exclusive possession, his co-tenant was entitled to an accounting.
Neither do I conceive that State v. Culver, supra, is indicative of the proposition for which it is cited, since that opinion adjudicated upon procedural and not substantive law.
*65 In any event, cases decided prior to the repeal of R.S. 2:38-3 and based upon the O'Connell case are not and cannot be evidence of the present common law.
Common law has been defined as:
"* * * The common law is described by Blackstone as the unwritten law (lex non scripta) as distinguished from the written or statute law (lex scripta), i.e., enacted law. That eminent authority says that the term included not only general but particular customs of certain parts of the kingdom and likewise those particular laws that are by custom observed only in certain courts and jurisdictions (Jones' Blackstone 107), and Kent says it includes `those principles, usages and rules of action applicable to the government and security of persons and property, which do not rest for their authority upon any express or positive declaration of the will of the Legislature.' (Kent's Comm. 471)."
Heise v. Earle, 134 N.J. Eq. 393 (E. & A. 1944).
In the light of the foregoing definition it follows that the common law does not arise by virtue of the enforcement of a statutory right; neither can it arise where there is an identical statutory right, since the common law has its origin in statements of principle found in the decisions of the courts and not from any express or positive statute.
Where a statute is repealed and there is no saving clause or a general statute limiting the effect of the repeal, the repealed statute, in regard to its operative effect, is considered as though it had never existed, except as to matters and transactions passed and closed. Di Angelo v. Keenen, 112 N.J.L. 19 (Sup. Ct. 1933), affirmed 115 N.J.L. 507 (E. & A. 1935). See also 15 C.J.S. Common Law § 12; 11 Am. Jur., Common Law, § 15.
The repeal of a statutory right which was in abrogation of the common law results in the revival of the common law right. 3 Sutherland on Statutory Construction (3d ed.), § 5301; Den ex dem. James v. DuBois, supra; Baum v. Thoms, 150 Ind. 378, 50 N.E. 357 (Sup. Ct. 1898).
The more recent adjudications in our sister states confirm the rule of the modern law that a tenant who has received the rents of a common property which are paid upon a letting which is binding on all interests or which purports to bind *66 them and is acquiesced in by all, is liable to account to his co-tenants. It is said that this rule obtains in some states as a creature of common law and in others by statute. New Jersey was numbered among those in the latter category. But regardless of the theory upon which the principle is bottomed, the great majority of the states recognize such a right. Annotation, 51 A.L.R.2d 388 (1957).
Since January 1, 1952 the limit of the right of a tenant to participation in an accounting of rents collected by a co-tenant in the absence of a claim of title or exclusion is that which existed under the common law prior to the enactment of the Statute of Anne, supra.
If we were, however, to adhere slavishly to the harsh common law as it existed ante 1705 we would reach a result that under modern concepts would shock the conscience. The consequence would be a sacrifice of what we now consider honest and fair dealing in the interests of pragmatic consistency. The common law is not a dead thing. It is a living rule and must expand with the times.
This cannot be better expressed than as was stated in State v. Culver, supra, where the court said, 23 N.J. at page 505:
"* * * One of the greatest virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court. There is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night. The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Dean Pound posed the problem admirably in his Interpretations of Legal History (1922) when he stated, `Law must be stable, and yet it cannot stand still." And what has been done in the past is but one of the factors determinative of the present course of our law  a truism which has not gone unrecognized among the great thinkers of the legal profession. Thus, Mr. Justice Holmes recognized that:
`To rest upon a formula is a slumber that, prolonged, means death'; Collected Legal Papers 306 (1920).
*67 Mr. Justice Cardozo has said:
`Few rules in our time are so well established that they may not be called upon any day to justify their existence as means adapted to an end. If they do not function they are diseased. If they are diseased, they must not propogate their kind. Sometimes they are cut out and extirpated altogether. Sometimes they are left with the shadow of continued life, but sterilized, truncated, impotent for harm'; Nature of the Judicial Process 98 (1921).
Professor Williston, in Some Modern Tendencies in the Law (1929), at page 125 observed:
`Uniform decisions of 300 years on a particular question may, and sometimes have been overthrown in a day, and the single decision at the end of the series may establish a rule of law at variance with all that has gone before.'
And Holdsworth, in describing the fairly wide limits within which judges under the Anglo-American case law system are enabled `to apply to old precedents a process of selection and rejection which brings the law into conformity with modern conditions,' has said:
`This process of selection and rejection has been applied to the law laid down in the Year Books; and generally the rules there laid down, which are still part of our modern law, have survived because they suit modern needs.' Essays in Law and History 161, 162 (1946).
But this is no new doctrine. The last words in Coke's Fourth Institute, his last and greatest work, expressed the same thought:
`And we will conclude with the aphorism of [Edmund Plowden] the great lawyer and sage of the law (which we have heard him often say) Blessed be the amending hand.'
The factors to be weighed in the balance in determining the present course of the law include the reasons for the rule, the present requirements of the environment in which the rule is to be applied, the dangers incident to any change and the evils resulting from its continuance. The power of growth is inherent in the common law."
In Loudon v. Loudon, 114 N.J. Eq. 242, at page 246 (E. & A. 1933), the court said:
"Great progress has been made in every field of human endeavor since 1777. Many and varied has been the changes. So has the law, from time to time, likewise undergone changes. Majestically the law always lends itself to an interpretation which results in the safeguarding and preservation of human and property rights. It is because law is based on reason and justice that it ultimately triumphs. *68 The science of the law must not merely be a pulsating and living factor, but a virile, wholesome, and ardent champion of truth and justice as well."
I concur in the result of the majority to affirm the judgment insofar as it requires an accounting of the rents actually collected by defendant since January 1, 1952 but upon the ground that we reject the common law rule as it originally existed and now conclude that in the interests of justice and equity, a tenant in common who has collected rents from the jointly owned property upon a letting binding on all interests or purporting to bind them and acquiesced in by all, must account to his co-tenants, who have a right to participate in such rents.
I shall now treat of my dissent which concerns the allowance by my respected colleagues of an accounting for the reasonable rental value of the premises occupied by defendant for a restaurant, tavern and parking lot.
It is recognized that where one tenant in common enters into possession of all or part of the jointly owned premises, his fellow tenants have no right to a recovery of the reasonable rental value of the portion so occupied under either the Statute of Anne, supra, or any statute of this State.
The majority of the states, however, have adopted the rule that where possession by one tenant was accompanied by an ouster or exclusion of a co-tenant, such recovery may be had. New Jersey follows this rule. There must generally be something more than an occupation by one tenant and a failure or forbearance to occupy by the co-tenant. O'Connell v. O'Connell, supra; Neubeck v. Neubeck, supra; Edsall v. Merrill, supra; Lloyd v. Turner, supra; Tolen v. Tolen, 96 N.J. Eq. 496 (Ch. 1924); Mastbaum v. Mastbaum, supra; White v. Smith, 70 N.J. Eq. 418 (Ch. 1906); Giguere v. Henke, 129 N.J. Eq. 7 (Ch. 1941); Finley v. Keene, 136 N.J. Eq. 347 (Ch. 1945); Jager v. Jager, 136 N.J. Eq. 379 (Ch. 1945); Murphy v. Regan, 8 N.J. Super. 44 (App. Div. 1950).
Concededly something less than a disseizen of one tenant is required to make the co-tenant so liable. New Jersey *69 has predicated this liability upon an "exclusion" of the former by the latter. "Exclusion" is a very elastic term. It may be actual or constructive. There is no firm test which may be applied to all cases.
The following are demonstrative of the courts' definition of that word:
Exclusion has been held to occur where there is no express refusal by the tenant in possession to allow his co-tenants to occupy, as where one of several tenants in common takes possession of premises not capable of joint occupancy. Edsall v. Merrill, supra; Davidson v. Thompson, 22 N.J. Eq. 83 (Ch. 1871).
It may also occur where there is no express refusal by the tenant in possession if possession has been taken by him and used by him as his own or for his exclusive profit. Maxwell v. Eckert, 109 A. 730 (Ch. 1920).
In some instances, the court concluded that where one tenant took possession of the premises for his sole use and benefit, the co-tenant must do something more than merely forbear from occupancy or see fit not to occupy. A failure to affirmatively demand possession where he has not been actually hindered from possession may result in a denial to such co-tenant of any recovery. Sailer v. Sailer, 41 N.J. Eq. 398 (Ch. 1886); Barrell v. Barrell, 25 N.J. Eq. 173 (Ch. 1874); Brown v. Havens, supra.
From the foregoing it can be seen that whether a tenant has been excluded depends upon the facts in each case. There cannot be any hard or adamant criterion to aid in the determination of whether an exclusion has occurred. Each case must be separately considered in the light of all of the circumstances present, including the relationship and conduct of the parties, the nature of the property and the use to which it was put.
An analysis of the facts in the case sub judice becomes necessary. These facts are most illuminative. The restaurant and tavern portion of the realty was occupied by defendant and his brother as tenants under a lease prior to defendant's marriage to plaintiff in 1925. At that time the brothers *70 conducted a speakeasy. Subsequent to the death of the brother and the marriage of plaintiff and defendant, the latter continued to conduct his business there  until 1933, as a speakeasy, and from that year to 1953 as a restaurant and licensed tavern. Fee simple title to the building proper was obtained by plaintiff and defendant as tenants by the entirety in 1927. In 1944 similar title was obtained to the parking lot which was used in conjunction with the restaurant and tavern.
Plaintiff contended in this action that she was a partner in the restaurant and tavern business conducted in the premises for which she now seeks rent as an excluded co-tenant. An examination of the complaint and pretrial order demonstrates that plaintiff's demand for judgment was concerned with an accounting in two parts, i.e., (1) of the restaurant and tavern business conducted in the premises, and (2) of the rents actually collected by defendant from the letting of apartments. There is no actual or implied demand for the reasonable rental value of the restaurant, tavern and parking lot. Plaintiff repeatedly testified that the partnership had its origin at the time of her marriage to defendant in 1925 and that she made continuous demands for an accounting of the profits from that business during their some 30 years of married life. She detailed alleged services furnished at the locus in quo to substantiate her asserted proprietary interest in the business. Implicit in this testimony and her contention was the claim that there was joint occupancy of that portion of the premises used for the restaurant, tavern and parking lot by plaintiff and defendant for their mutual benefit as partners. She could not consistently have contended that the premises were occupied by a partnership composed of plaintiff and defendant and in the same breath contend that she was excluded from the premises.
Having failed to substantiate a claimed partnership, she now reverses her position and seeks relief upon the alternative assertion that she has been excluded from the premises by defendant. The facts necessary to sustain this latter position are entirely inconsistent with the facts necessary to *71 sustain her former position. They are diametrically opposed to her contention that she was a partner.
In Flint Frozen Foods, Inc., v. Firemen's Ins. Co. of Newark, New Jersey, 8 N.J. 606, at page 611 (1952), the court said:
"* * * In its zeal, moreover, to recover on the policy the plaintiff has placed itself in the untenable position of relying on and arguing inconsistent facts. At one and the same time it seeks to claim both as an assignee of Einhorn's and as an undisclosed principal whose interest was directly insured by the policy. This it cannot successfully do. While a party may plead inconsistent claims or defenses, Rule 3:8-5(b), and `may argue inconsistent principles of law, he cannot be heard here to contend for two diametrically opposed sets of facts.' In re Perrone's Estate, 5 N.J. 514, 527 (1950)."
So here, having elected to urge that the partnership of which she was a member occupied the premises, she cannot now be heard to advance inconsistent facts which would, in effect, be a denial of the truth of her sworn testimony. She may have overreached herself in her zest to recover, but we are not responsible for the result.
Also, although she repeatedly affirmed on the witness stand that she made numerous and continuous demands for an accounting of the rents actually collected by defendant from the apartments, she denied that she had ever either demanded possession or the payment of the rental value for the restaurant, tavern or parking lot. Her conduct constituted, in the least, an acquiescence in defendant's possession of the premises. Such implied consent to the use of the premises is more consistent with human experience than her present contention. It is self-evident, from the testimony, that she shared indirectly in the profits of the business conducted by defendant in the property. This was his sole source of income. From the proceeds of this business he supported plaintiff and her two sons  his stepchildren  and obtained the means to make additional investments. It is not plausible to conclude that under these circumstances she would have *72 either demanded the right to use the property or contemplated any charge for the reasonable rental thereof.
Under such circumstances as exist here, a wife who, without remonstrance, permits her husband to use jointly owned realty for his business purposes and permits him to expend a part of the proceeds of his use for their living expenses, should be presumed to have consented to such use.
In Jones v. Davenport, 44 N.J. Eq. 33, 47 (Ch. 1888), the court said:
"As long ago as 1722, Lord Macclesfield declared that where a married woman held a separate estate, and her husband got possession of any part of its principal, he was bound to account to her for it, but that where she permitted him to receive the income of her estate, and to use it, without making the least objection to him, or to the debtor who paid the money, or to her trustees, it should be presumed that she consented that he should use the money as his own. Powell c. Hankey, 2 P. Wms. 82. The rule, as thus stated, is founded on right reason and in good sense. A wife, by permitting her husband to take her income and make such use of it as he sees fit, induces him to live in a style much more expensive than he otherwise would. He spends more for her, and gives her more to spend than he would if she required him to pay her income over to her. And she gets just as much benefit, as a general rule, from his increased expenditures as he does. It would, in many cases, not only be extremely unjust, but ruinous, if the wife could, after years of silence, call upon her husband to return to her everything he had received for her. A rule which permitted her to do so would very greatly multiply the hazards of business, and serve as a new encouragement to fraud."
In Pieretti v. Seigling, 134 N.J. Eq. 105, 108 (Ch. 1943), the court said:
"Complainant urges that it is the duty of a husband to support his wife and this, of course, is true within the limit of his means. But often the wife, as well as her husband, wishes to live on a scale of expense which they can afford only because she contributes from her own income. A wife is not entitled to reimbursement from her husband for her contributions toward the payment of ordinary current family expenses in the absence of an agreement for reimbursement."
See also Knickerbocker Trust Co. v. Carhart, 71 N.J. Eq. 495, at page 505.
*73 In T.G.W. Realties v. Long Island Bird Store, 151 Misc. 918, 272 N.Y.S. 602, at page 606 (Sup. Ct. 1934), the court said:
"On December 3, 1932, her husband made the conveyance complained of in these counterclaims. Then, for the first time, Mrs. Altman decided to make claim for her share of all the back rent. It is not necessary to discuss the reasons which induced her suddenly to assert rights which she had ignored during all these years of common ownership. Her long period of acquiescence has resulted in a waiver of her claims. Where a wife permits her husband to collect all of the income from her separate estate and use it for his own purposes, or to pay the household and family expenses therefrom, a gift of the income from the wife to the husband is presumed to have taken place. She cannot later demand that he account to her for it. She is not permitted to induce her husband to maintain a standard of living based upon her consent that he keep and use the income and then revoke that consent and insist that he return it. The injustice which would result from such conduct is amply demonstrated by the facts of this very case. This rule, founded not on technical considerations of waiver or estoppel, but rather on equitable considerations of justice and fair play, has been followed by the courts of this and many other states."
The rationale of the foregoing cases is particularly apt and pertinent to the facts here present.
The facts here lead to the conclusion that there was no ouster or exclusion of plaintiff, but rather that defendant occupied a portion of the premises for the conduct of a tavern, restaurant and parking lot, in reliance upon plaintiff's implied acquiescence and consent. That the marital situation has soured is no reason to permit a reconsideration and revocation of that consent. She should not now be permitted to allege an exclusion but should be estopped by her conduct and acceptance of some of the benefit of the business.
I would reverse the judgment insofar as it requires "That the defendant account to plaintiff for * * * the items of reasonable net rental for the use and operation of the restaurant and tavern business, and parking lot, carried on by the defendant on the said premises."